[Civ. No. 3233. Second Appellate District, Division Two.—December 22, 1920.]

## CALIFORNIA ORANGE COMPANY (a Corporation), Respondent, v. RIVERSIDE PORTLAND CEMENT COMPANY (a Corporation), Appellant.

[1] DAMAGES—DEPOSIT OF CEMENT DUST ON ORANGE TREES—WRONGFUL OPERATION OF TWO PLANTS—SEVERAL LIABILITY.—Where two cement companies wrongfully operate their respective cement plants in such manner that deposits of cement dust, blown from the plants toward a neighboring orange grove, are incrusted upon the leaves of the trees, the commingling of the dust from their several and independent tortious acts does not make them joint tort-feasors; but each is liable for only such proportion of the total damage resulting from the commingled dust emitted into the atmosphere from the two plants as is caused by its own plant.

[2] ID.—APPORTIONMENT OF DAMAGE—PROVINCE OF TRIAL JUDGE. — In an action against one of said companies, in determining the amount of damage that should be assessed against it, the trial court is at liberty to estimate as best it can, from the evidence before it, how much of the total damage, caused by the operation of the two companies, was occasioned by the defendant's plant, and, in so doing, might measure with a liberal hand the amount of damage caused by defendant's mill.

[3] ID.—ORIGIN OF DAMAGE—ESTIMATION OF AMOUNT CHARGEABLE TO PARTICULAR SOURCE.—In cases of this sort, if it is impossible to distinguish between the damage arising from the defendant's actionable injury and damage which has another origin, the jury, or the trial judge if the cause be tried without a jury, should be left to make from the evidence the best possible estimate, and to award the plaintiff compensatory damages for the actionable injury.

[4] ID. — EMISSION OF DUST FROM CEMENT-MILL — QUANTITY PRECIPITATED UPON TREES—EVIDENCE.—In this action to recover damages for injuries to plaintiff's orange orchard, alleged to have been caused by the deposit on the trees of cement dust from defendant's cement-mill, the evidence showed that plaintiff's orchard suffered substantial damage, directly attributable to defendant's wrongful operation of its cement plant, whereby cement dust, in quantities sufficient to cause material injury, was precipitated upon plaintiff's trees.

---

1. Joint liability of independent tort-feasors, the acts of each of which alone cause, or tend to produce, some damage, note, 9 A. L. R. 939.

[5] ID.—EXTENT OF INJURY—MEASURE OF DAMAGES.—In such an action, the plaintiff is entitled to recover compensatory damages not only for the loss of crops during the years that defendant's plant was wrongfully operated and for the increased labor in caring for the land during those years, but also for the continuing injury to the trees themselves, as a result of which the crops during the succeeding years were also decreased.

APPEAL from a judgment of the Superior Court of Riverside County. M. T. Farmer, Judge. Affirmed.

The facts are stated in the opinion of the court.

H. L. Carnahan, W. G. Irving, McFarland & Irving and Pillsbury, Madison & Sutro for Appellant.

Rohe, Jeffers & Devin and Purington & Adair for Respondent.

FINLAYSON, P. J.—This is an action at law to recover damages for injuries to plaintiff's orange orchard, caused by the deposit on the trees of cement dust from defendant's cement-mill. Plaintiff recovered judgment for a total of $6,300, of which $3,500 was for loss and injury to the crops for the years 1910, 1911, and 1912; $300 was for the increased labor and cost in the care of the trees, and the balance, $2,500, was for injury to the trees. From that judgment defendant appeals.

The orange orchard is located on a piece of high bench land situated on the northerly bank of the Santa Ana River, in Riverside County. It lies about midway between defendant's cement-mill and the cement-mills of the California Portland Cement Company. Defendant's mill is about one and a half miles southwesterly of plaintiff's grove. The two mills of the California Portland Cement Company are northwesterly of the grove and distant therefrom about one and one-half miles. There is no question but that cement in considerable quantities from the mills of the California Portland Cement Company, as well as from defendant's mill, settled upon plaintiff's orange trees, coating the leaves with a white, ashen dust, which, incrusting from the action of dew and moisture, so that it can be neither washed off by the rains nor blown off by the winds, re-

mained on the leaves for the period of their life, that is, from two to three years. There is an abundance of evidence in the record tending to show that cement dust that thus is incrusted upon the orange leaf seriously interferes with the leaf's respiration and the formation of the starch foods upon which the tree lives. As a result, the tree becomes greatly weakened, the leaves stunted, and the internods shortened, so that the tree, in its weakened condition, blossoms more profusely, and the fruit falls off before maturing, thus greatly decreasing the yield of every tree the leaves of which are thus coated with the cement dust.

Dust-catching apparatus, commonly known as "treaters," designed to prevent, so far as possible, the escape of cement dust into the atmosphere, were installed in defendant's plant in January, 1913. The action was commenced August 14, 1913, and was tried in May, 1917.

[1] The California Portland Cement Company and defendant were not joint tort-feasors. Their respective torts —wrongfully operating their respective cement plants in such manner that deposits of cement dust, blown from the plants toward plaintiff's orange grove, were incrusted upon the leaves of plaintiff's trees—were several when committed, and did not become joint merely because of a commingling of the dust from the respective plants and a union of the consequences proceeding from the several and independent tortious acts. (*Miller* v. *Highland Ditch Co.*, 87 Cal. 430, [22 Am. St. Rep. 254, 215 Pac. 550]; *William Tackaberry Co.* v. *Sioux City etc. Co.*, 154 Iowa, 358, [Ann. Cas. 1914A, 1276, 40 L. R. A. (N. S.) 102, 132 N. W. 945, 134 N. W. 1064]; Sutherland on Damages, 4th ed., sec. 1059.) Defendant is liable for only such proportion of the total damage resulting from the commingled dust emitted into the atmosphere from the plants of the two cement companies as was caused by its own plant. (*Miller* v. *Highland Ditch Co., supra.*) [2] In determining the amount of damages that should be assessed against this defendant, the trial court was at liberty to estimate as best it could, from the evidence before it, how much of the total damage, caused by the operations of the two cement companies, was occasioned by defendant's plant, and, in doing so, might measure with a liberal hand the amount of damage caused by defendant's mill.

(*Learned* v. *Castle*, 78 Cal. 454, [18 Pac. 872, 21 Pac. 11];
*Jenkins* v. *Pennsylvania R. Co.*, 67 N. J. L. 331, [57
L. R. A. 309, 51 Atl. 704]; *City of Mansfield* v. *Bristor*, 76
Ohio St. 270, 285, [118 Am. St. Rep. 860, 10 Ann. Cas.
767, 10 L. R. A. (N. S.) 806, 81 N. E. 631].) Though in
cases of this sort entire accuracy is impossible, and the dif-
ficulty of accurately proportioning and assessing the dam-
age done by defendant's mill is great, still that difficulty
would have been avoided had defendant but taken care that
no occasion should arise requiring such proportioning and
assessing of the whole damages. In *Ogden* v. *Lucas*, 48 Ill.
492, which was an action to recover damages for the de-
struction of corn by trespassing cattle, where it appeared
that a part of the cattle was the property of others than
the defendant, the court said: "In cases of this sort, entire
accuracy is impossible. The jury had a right to consider
from the evidence how much corn had been destroyed, and
what proportion of the cattle in the field were turned in
by the defendant, and thus arrive at as near an estimate
of the damages as the nature of the case would permit."
To the same effect is *Harrison* v. *Adamson*, 86 Iowa, 693,
[53 N. W. 334]. *Washburn* v. *Gilman*, 64 Me. 163, [18
Am. Rep. 246], was an action upon the case for a nuisance
occasioned by casting refuse material out of the defendant's
sawmill into a natural stream, whence it was carried by
a spring freshet upon plaintiff's land. The court held the
defendant liable for the damages arising from his own
wrongful or negligent act, but not for those arising from
the negligent acts of others, saying: "The difficulty may
be great of accurately proportioning and assessing the
damage done by the defendant, but that difficulty the de-
fendant could have avoided had he taken care that no
occasion should arise requiring such assessment of dam-
ages." To the same effect is *City of Mansfield* v. *Bristor*,
*supra*, where the court said: "True, it may be difficult to
determine how much dirt came from each colliery, but the
relative proportion thrown in by each may form some guide,
and a jury in a case of such difficulty, caused by the
party himself, would measure the injury of each with a
liberal hand."

Appellant does not contend that the lower court charged
it with more than its proportion of the total damages caused

by the plants of the two companies. That point is not raised in the briefs. Appellant's contention is stated in its opening brief as follows: "The evidence is insufficient to show that any material discharge from the cement mill of appellant, was precipitated upon the lands of the plaintiff in any *appreciable* amount." The trial court found that, from about the early part of the year 1910 until the installation of the "treaters" in January, 1913, defendant maintained and operated its cement-mill in such a manner that "large quantities of noxious and filthy dust, smoke, gases, vapors, and cement continuously escaped from said manufactory and were continuously discharged therefrom into the atmosphere and thence upon the land of this plaintiff"; also that after defendant commenced to operate its mill, it operated it in such a manner that "a large amount of dust and matter arising from the various stages of the manufacture of cement therein were discharged therefrom into the atmosphere and were thence discharged and precipitated upon said land and premises of plaintiff in quantities aggregating many tons per annum"; and, further, that, "throughout said period, said dust and matter settled upon plaintiff's said land, and upon the trees and crops growing thereon, and coated the leaves, foliage, and fruit thereof with an ash-colored deposit of dust and matter, and damaged the trees growing upon said land, thereby retarding and weakening their growth and rendering them less vigorous and less productive, and damaging the fruit and other crops above mentioned, growing upon said land, both by lessening the quantity and by impairing the quality and value of such fruit crops."

Defendant claims that these findings are not supported by the evidence. All presumptions are in favor of the findings, and under the well-settled rule we cannot disturb them if there is any substantial evidence to support them.

The gravamen of appellant's contention seems to be that the evidence is insufficient to show that cement dust from its mill settled upon respondent's orange grove in "*large*" quantities. It seems to be conceded that some dust from appellant's mill was precipitated upon respondent's orange grove. If, as we believe, enough dust from appellant's plant was deposited upon respondent's trees

to cause them some damage, then, since appellant does not claim that it has been charged with more than its proportion of the damages caused by the dust from the plants operated by the two companies, the judgment, in so far as it rests upon the above-mentioned findings, must be affirmed, regardless of the *quantum* of dust from appellant's mill.

A number of witnesses testified that they frequently saw clouds of cement dust from appellant's plant float over and settle upon respondent's grove. One witness, L. V. W. Brown, describing his observations, said: "I observed the operation of the cement plant [defendant's cement plant] since it started in 1910. I observed the smoke and emissions from it. Of course, there was a great deal of dirt emitted previous to the time the treaters were put on, and that followed the direction of the wind. At other times, when there was no wind, there would seem to be a great pall of dirt that would be thrown into the air, and would hang more or less continuously over that district until the wind took it away. This pall of dirt or dust or smoke in the air seemed to extend three miles, in every direction." Another witness, Professor Babcock, who made a number of measurements of the cement dust carried into the air from the mills of these two cement companies, testified that, as a result of his experiments and measurements, he calculated that in the years 1909, 1910, 1911, and 1912 there fell, per year, at least 150 tons of cement dust on plaintiff's 163 acres. He further testified that his calculations showed that, of the amount so falling annually on plaintiff's property, about one-fourth came from the mills of the California Portland Cement Company and the balance from "some other source." Defendant's plant was the only other possible source whence the dust could have come. This, and much other evidence that could be referred to if necessary, is sufficient to justify the finding that cement dust, "in large quantities," was discharged into the atmosphere from defendant's plant and thence precipitated on the trees in plaintiff's orange orchard.

To cause injury to plaintiff's trees, for which he would be entitled to recover damages, it was not necessary that great quantities of the cement dust from defendant's mill should have settled upon the trees. A slight coating of

the dust on the leaves of an orange tree will cause serious injury and consequent damage. Professor Peirce, of Stanford University, testified that the hard opaque crust that forms on the leaf when the cement dust is affected by moisture in the atmosphere interferes with the action of sunlight on the plant. Sunlight, he said, is the one thing that the plant requires to produce the necessary starch and sugar, which is the plant-food upon which the tree thrives. This plant-food, he testified, is stored up in the daytime when the leaf is at work, and consumed during the night. From an experiment conducted by Professor Peirce in the courtroom during the trial, it appeared that if a leaf were only partially covered with the opaque crust formed by the ash-colored deposit of cement dust, so that a part only was shaded thereby, more starch would be found in the unshaded than in the shaded part of the leaf.

Appellant calls our attention to the fact that, during the operations of its plant throughout the period complained of by respondent, the orange grove was subject to other and natural causes of injury and deterioration, such, for instance, as lack of vitality due to want of proper care in the early stages of the orchard's growth, killing frosts, and high winds blowing directly from the north through the Cajon Pass—referred to by the witnesses as "northers." Professor Peirce's expert testimony, if accepted as true, justified the lower court in inferring that any discernible amount of cement dust, incrusted on the leaves of the orange trees, by its inevitable interference with the free action of sunlight, will cause appreciable damage to the trees. [3] In cases of this sort, the law is that if it be impossible to distinguish between the damage arising from the defendant's actionable injury and damage which has another origin, the jury, or the trial judge if the cause be tried without a jury, should be left to make from the evidence the best possible estimate, and to award the plaintiff compensatory damages for the actionable injury. In *Jenkins* v. *Pennsylvania R. Co.*, 67 N. J. L. 331, [57 L. R. A. 309, 51 Atl. 704], the rule was stated as follows: "It many times happens that the damage arising from an actionable injury, chargeable to the defendant, is, in the nature of things, or from the circumstances of the cases, indistinguishable from other damage occurring at

the same time, attributable to the acts of an independent tort-feasor or to natural causes. In such cases, since the injured party cannot supply the materials necessary to enable the jury to make an exact computation of the damages in suit, the approved practice is to leave it to the good sense of the jury, as reasonable men, to form from the evidence the best estimate that can be made under the circumstances, as a basis of compensatory damages for the actionable injury.'' The evidence here shows that plaintiff's grove, though not subject to any greater damage from the elements than other groves situated outside the zone of falling cement dust, did not produce as did the groves similarly situated outside the dust zone. W. B. Gregor, who had a grove about a mile and a half north of defendant's property, testified that there was no deposit of grayish substance on the trees in his grove, and that the blossoms on his trees did not fall off as they did from the trees in defendant's grove.

[4] From the foregoing we think it clear that the evidence shows that plaintiff's orchard suffered substantial damage, directly attributable to defendant's wrongful operation of its cement plant, whereby cement dust, in quantities sufficient to cause material injury, was precipitated upon plaintiff's citrus trees; and that, therefore, the evidence is sufficient to support the findings of which appellant complains.

There was ample evidence to justify the finding (appearing in the conclusions of law) to the effect that plaintiff was damaged in the sum of $300 for increased labor and cost in the care of its orange orchard. Teams were used in the cultivation of the grove. The ranch foreman testified that the cement dust got on the horses' shoulders, under the harness, from brushing against the trees while dragging the cultivator, thereby causing their shoulders to become sore and necessitating extra care, whereby an hour a day was lost—a daily loss of about forty-five cents for each team that was in use during the season in each of the years 1910, 1911, and 1912, and totaling more than $300.

[5] Finally, it is contended that plaintiff is not entitled to damages for injury to the trees in addition to damages for loss of crops and increased labor. It will be recalled

that the lower court found that plaintiff is entitled to recover: (1) the sum of $3,500 for loss of and injury to the orange crops during the years 1910, 1911, and 1912; (2) the sum of $300 for increased labor in the care of the land; and (3) the sum of $2,500 for injury to the trees. Appellant claims that, if respondent be allowed compensation for loss of and injury to the 1910, 1911, and 1912 crops, together with compensation for the increased labor and cost in caring for the grove while those crops were growing and maturing, it is not entitled, in addition to those items, to compensation for injury to the trees. Appellant, to quote from its brief, bases this contention "on the fact that the trees in plaintiff's grove are in as good condition now as they would have been had no dust ever been precipitated thereon."

A number of witnesses testified that, subsequent to the installation of the dust "treaters" in defendant's plant in January, 1913, and prior to the trial in May, 1917, plaintiff's trees had completely recovered. But it does not therefore follow that plaintiff's injury was confined to deterioration in the crops that matured in 1910, 1911, and 1912, and the increased cost of bringing those crops to maturity. The measure of plaintiff's damage is the amount that will compensate it for all the detriment proximately caused by defendant's wrongful operation of its plant from the time when it commenced operations in January, 1910, until it installed the "treaters" in January, 1913. The measure of damages in cases of this character is found in section 3333 of the Civil Code, reading: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

The 1912 crop was the last crop picked and packed prior to the commencement of the action in August, 1913. Since early in 1913 defendant, by the installation of dust treaters, has collected about ninety-five per cent of the dust that otherwise would have escaped into the atmosphere from its cement plant and settled on plaintiff's trees. But the dust that incrusted on the leaves that were newly put forth by plaintiff's trees in the year 1912 would remain

on those leaves for the period of their life, which is between two and three years, meanwhile seriously interfering with plant respiration and the formation of starch and sugar, thereby tending to tree starvation. The injury caused by the dust that settled on the trees in the years 1911 and 1912 would, therefore, naturally tend to decrease the 1913 and 1914 crops. And though the trees may have "come back" when observed by the witnesses who testified that they saw them shortly before the trial in May, 1917, still it can readily be seen that there would be some continuing injury to the trees, and some loss due thereto, after the picking and packing of the 1910, 1911, and 1912 crops. For these reasons we conclude that, in addition to compensatory damages for loss due to diminution of and deterioration in the crops for the years 1910, 1911, and 1912, and in addition, also, to the increased cost in the care of the land due to the dust galling the shoulders of the animals used in cultivating the grove during those three years, plaintiff was entitled to compensation for the continuing injury to the trees due to the dust from defendant's plant that settled on them in the years 1911 and 1912, by reason of defendant's wrongful operation of its plant in those two years—tortious conduct, the effects of which would manifest themselves in the 1913 and 1914 crops, thus making it necessary to give the trees an increased amount of fertilizer and care in order to mature as much of the 1913 and 1914 crops as possible.

There was ample evidence to sustain the court's finding that $2,500 is the amount necessary to compensate plaintiff for this continuing injury to the trees. It may be inferred from the testimony of several witnesses whose experience qualified them to testify as experts that the care and fertilization necessary to bring the trees back to a normal condition in the years 1913 and 1914 would be about double the amount that it would have been necessary to expend on the grove if the trees had suffered no injury continuing after the harvesting of the 1912 crop. The amount actually expended for the care, cultivation, and fertilization of the trees for the years 1913 and 1914 averaged $55.39 per acre. It is a reasonable

inference from the testimony of the witnesses that one-half of this sum, $27.69 per acre, is the additional amount made necessary by the continuing injurious effects of the dust that settled on the trees in the years 1911 and 1912—injurious effects that would naturally continue to manifest themselves in the 1913 and 1914 crops, and, possibly, in the 1915 crop also. This additional amount, necessary to be expended for increased care and fertilization, totals considerably more than the sum of $2,500 allowed by the court. Besides which this sum does not take into consideration another element of loss for which plaintiff was entitled to compensation—the inevitable deterioration of and diminution in the 1913 and 1914 crops. This continuing injury, and the damages resulting therefrom, must inevitably have decreased, by the amount of such damages, the vendible value of plaintiff's grove. There is no reason to believe that the $2,500 allowed for injury to the trees included any of the damage covered by the two other items of injury allowed by the court— $3,500 for injury to the 1910, 1911, and 1912 crops, and $300 for increased labor in maturing those crops. Every intendment is in favor of the action of the court *a quo;* and unless appellant specifically calls our attention to something in the record overcoming this presumption, we are bound to assume that the award to plaintiff of $2,500 for injury to the trees included only such injury as might affect one or more of the crops subsequent to the 1912 crop—the last crop for injury to which plaintiff was specifically awarded a recovery. This conclusion is further fortified by the following excerpt from the opinion of the learned judge who tried the case, printed in appellant's closing brief: "Had it not been for this freeze [the freeze of 1913], with the elimination of the cement dust nuisance which took place in December, 1912, when the treaters were installed, the plaintiff's grove would have required no more care and attention than a fifty per cent increase of fertilization and some added cultivation. Such a percentage, based upon the expenditures made by the plaintiff on these items during the years both before and subsequent to the commencement of this action, would not exceed $2,500, which figure I consider a just propor-

tion of the injury to the grove suffered by reason of the total cement dust emitted from both plants."

Appellant has failed to point out any reversible error, and the judgment, therefore, is affirmed.

Thomas, J., and Weller, J., concurred.