HILL, RESPONDENT, v. CHAPPEL BROTHERS OF MON-TANA, INC., APPELLANT.

(No. 6,988.)

(Submitted September 19, 1932. Decided December 13, 1932.)

[18 Pac. (2d) 1106.]

*Mr. D. L. O'Hern, Mr. R. V. Bottomley* and *Mr. Henry L. Burns,* for Appellant, submitted a brief; *Mr. O'Hern* and *Mr. Burns* argued the cause orally.

*Mr. W. B. Sands* and *Mr. Max P. Kuhr,* for Respondent, submitted a brief and argued the cause orally.

HONORABLE JEREMIAH J. LYNCH, District Judge, sitting in place of MR. JUSTICE GALEN, disqualified, delivered the opinion of the court.

This is an action for trespass. It was begun on December 4, 1930. The amended complaint, filed on January 26, 1931, is in six counts. The first count alleges that the defendant is now, and at all the times mentioned therein was, a corporation; that the plaintiff during all the time mentioned therein was in the rightful possession of approximately 9,700 acres of land in the Fort Belknap Indian Reservation under a lease from the Indian allottees; that plaintiff leased the land to pasture his sheep and horses and it was valuable for that purpose; that during all the time preceding the commencement of the action the defendant was in possession of approximately 115,000 acres of land in said reservation under a lease from the Indians, and assumed to pasture thereon 8,000 or more head of horses; that said tract is fenced on the east, west and south sides, but is not fenced on the north side; that it was at all times insufficient to properly feed more than 4,000 head of horses, a fact known to the defendant; that almost continuously for two years, in consequence of the scarcity of feed on the land of defendant, its horses in great numbers trespassed on the land of plaintiff and ate or destroyed the grass growing thereon; that during said period the defendant wilfully and knowingly drove its horses upon and over said land many times, thereby further injuring the pasturage; that plaintiff often requested the defendant to keep its horses away from his land and spent much time and effort in driving them off and in attempting to keep them off his land. There is a prayer for general, special and exemplary damages. The other counts, charging like trespasses and couched in similar language, have a place in the amended complaint by reason of assignments from Chris D. Miller and Henry G. Miller, Angus Morrison and K. T. Butler, Matador Land & Cattle Company, Kuhr Land & Livestock Company, and Hans F. Siert and Peter T. Siert, respectively, to the plaintiff.

The answer admits the allegations of the amended complaint as to the incorporation of the defendant and its possession under lease of approximately 115,000 acres of land in the reservation, but denies positively or on information and belief all the other allegations thereof.

On October 13, 1931, the plaintiff filed a supplemental complaint in four counts based on a continuation by the defendant of the alleged trespasses on the lands of himself, Chris D. Miller and Henry G. Miller, Kuhr Land & Livestock Company, and Hans F. Siert and Peter T. Siert, from on or about December 4, 1930, to October 1, 1931. The defendant answered by denying positively or on information and belief all the allegations contained in the supplemental complaint.

The case was tried by the court sitting with a jury. At the close of his case in chief the plaintiff procured the dismissal of the fourth cause of action. Thereafter the trial resulted in a verdict in his favor for actual damages in the lump sum of $15,000. Judgment in conformity with the verdict was thereupon entered. The motion of the defendant for a new trial having been denied, it has appealed from the judgment.

It appears from the record without controversy that the Fort Belknap Indian Reservation has an area of about 500,000 acres; that the lease of defendant of land therein embraced about 122,000 acres, and that the leases of plaintiff and his assignors, Chris D. Miller and Henry G. Miller, Angus Morrison and K. T. Butler, Kuhr Land & Livestock Company, and Hans F. Siert and Peter T. Siert, of lands therein embraced, respectively, about 7,900, 91,000, 4,160, 107,600 and 9,500 acres. It further appears from the record that the land of defendant lay in the southwestern part of the reservation, and the lands of plaintiff and his assignors, with the exception of a tract of about 100,000 acres held by the Kuhr Land & Livestock Company, lay directly north thereof. The 100,000-acre tract lay east and north of defendant's land. The leaseholds of plaintiff and his assignors were not inclosed when their occupancy began. In the months of April

and May, 1930, however, the Millers fenced approximately 41,000 acres of their leasehold and thereafter used the same to pasture their cattle. The Sierts' land and the Millers' fenced land adjoined defendant's leasehold. The land of defendant was fenced on the west, south and east sides, and after the erection of the Miller fence to the extent of about seven miles on the north side. A stretch of about nine miles extending eastward from the reservation line always remained unfenced.

The testimony in behalf of plaintiff showed or tended to show that with the exception of the 41,000-acre tract mentioned above, he and his assignors used their lands principally for the grazing of sheep, while the defendant used its land exclusively for the grazing of horses. Owing to a severe drouth in the years 1929, 1930 and 1931, grass was shorter than usual on the reservation, and particularly so on the land of defendant. Much of the time its horses in considerable proportions did not live on the leasehold at all, but ranged almost at will all over the reservation (and even beyond it) from the Milk River Valley on the north, to the Little Rocky Mountains on the south and from the west line fence in Blaine county to the east line fence in Phillips county. Bands of them frequently entered the leaseholds of plaintiff and his assignors and consumed grass thereon. Nor were they alone in their trespasses. Other steeds, owned or ownerless, as the case may be, kept them company in goodly numbers, but they were nearly always in the minority, varying downward, as they did, from six-tenths to one-tenth of the whole. Occasionally employees of the defendant drove many of its vagrant horses on the lands of the plaintiff, the Millers, and the Kuhr Land & Livestock Company. During the three years referred to, the defendant kept between 7,000 and 8,000 horses on the reservation. The defendant's own range was always "fed down" very close and its horses ate a great deal of the grass which grew on the lands of plaintiff and his assignors, thereby depriving their sheep to some extent of necessary feed. Indian agents and others complained from time to time

to the defendant regarding the trespasses being committed by its horses.

The testimony on the part of defendant showed or tended to show that at no time did it have to exceed 5,600 horses on the reservation; in the fall of the year the number was far less. Formerly government regulations permitted one horse for each twenty acres, but now they permit one horse for each twenty-four acres. Under favorable conditions fifteen acres will support such an animal. The defendant employed riders to keep its horses within its land and to return those of them which happened to stray away. Neither the fore-·man nor any other employee of the defendant, so far as he knew, drove any of its horses on the lands of plaintiff and his assignors. Horses belonging to the defendant and others which strayed on farms west of the reservation were regularly driven back by the owners thereof. Sometimes they left them on what was designated as Kuhr Land & Livestock Company lease No. 9, being a tract of about 7,600 acres and included in the area of 107,600 acres hereinbefore mentioned.

Defendant contends there was no evidence of overstocking of its leasehold on its part. We cannot acquiesce in that position. At best the evidence conflicted in respect to whether or not there was overstocking, and, therefore, it became a question of fact for the jury, if liability attached at all. But, defendant argues, even though it be conceded that it did overstock, still it was incumbent on plaintiff to definitely show the number of horses which left its land in search of food, as distinguished from the number, if any, which roamed away in response to their natural inclinations. No such burden rested upon plaintiff. It is more in consonance with justice and the rules of Code pleading to hold, as we do, that the duty of alleging and proving that some of its horses strayed on the lands of the parties complaining, under the natural urge to travel and not because they needed food devolved on the defendant. (Sec. 9147, Rev. Codes 1921.) In speaking thus we appreciate, of course, the difficulty of making proof of that character.

The plaintiff, then, having made a prima facie case of overstocking and consequent trespasses on the lands of himself and his assignors, was there liability therefor on the part of defendant? The answer should be, and is, in the affirmative. Where one stocks his own land with a greater number of horses than it can properly support, so that in order to sustain life or obtain the necessary amount of grass they are forced to pasture on the lands of others, the duty to make compensation to the persons wronged is as clear as it would be if they were driven thereon in the first instance. (*Lazarus* v. *Phelps*, 152 U. S. 81, 14 Sup. Ct. Rep. 477, 38 L. Ed. 363; *Shannon* v. *United States*, (C. C. A.) 160 Fed. 870; 1 R. C. L. 1105; 3 C. J. 133.) Fence laws do not furnish immunity to one who, in disregard of property rights, turns loose his cattle under circumstances showing that they were intended to graze upon the land of another. (*Light* v. *United States*, 220 U. S. 523, 31 Sup. Ct. Rep. 485, 55 L. Ed. 570; *Dorman* v. *Erie*, 63 Mont. 579, 208 Pac. 908; compare *Schreiner* v. *Deep Creek Stock Assn.*, 68 Mont. 104, 217 Pac. 663.)

Defendant urges that the plaintiff was not qualified to testify to the value of the grass on his land which was eaten by trespassing horses in the years 1929, 1930 and 1931. He had been in possession of the property, or most of it, since July, 1928, had used it for grazing his sheep, had paid rent therefor at the rate of twelve and one-half cents an acre per year, and had seen with his own eyes the injury done to the pasturage by these horses. The witness possessed the necessary qualifications and his testimony as to such value was competent. (*Herrin* v. *Sieben*, 46 Mont. 226, 127 Pac. 323; *Tandy* v. *Fowler*, (Tex. Civ. App.) 150 S. W. 481; *Kellar* v. *Sproat*, 35 Idaho, 273, 205 Pac. 894; *Pacific Livestock Co.* v. *Murray*, 45 Or. 103, 76 Pac. 1079; 5 Nichols on Applied Evidence, 4631, 4632; 3 Jones' Commentaries on Evidence, sec. 1265.) What we have just said applies with equal force to the witnesses Chris D. Miller and William H. Kuhr, and their testimony along similar lines. Not only was the testimony of all of them competent; it was also rele-

vant and material. The plaintiff and his assignors being in possession of the leaseholds and enjoying their use to a limited extent, the measure of damages was the reasonable value to them of the grass consumed or destroyed by defendant's horses. (*Pacific Livestock Co.* v. *Murray,* above; *White River Sheep Co.* v. *Barkley,* 37 Ariz. 49, 288 Pac. 1029; *Boggs* v. *Seawell,* 35 Idaho, 132, 205 Pac. 262; *Anderson* v. *Jensen,* 71 Utah, 295, 265 Pac. 745; *Cleary* v. *Shand,* 48 Utah, 640, 161 Pac. 453; *D. C. Wheeler, Inc.,* v. *O'Brien Bros.,* 40 Nev. 414, 165 Pac. 339.)

It is a well-established rule of evidence that a witness may ▮ estimate the number of animals he has seen in a given place and the proportion of them that bore a particular brand. He may also, if qualified by observation and experience, estimate what proportion of a crop has been consumed or destroyed in a certain way or by a certain agency. (*Sabine & E. T. Ry. Co.* v. *Brousard,* 69 Tex. 617, 7 S. W. 374; *Bufford* v. *Little,* 159 Ala. 300, 48 South. 697; 3 Jones' Commentaries on Evidence, sec. 1258; 22 C. J. 566, 567; *Harpending* v. *Shoemaker,* 37 Barb. (N. Y.) 270; *Atchison, T. & S. F. R. Co.* v. *Miller,* 39 Kan. 419, 18 Pac. 486; *Beam* v. *Farmers' Union M. Hail Ins. Co.,* 127 Kan. 234, 273 Pac. 440, 62 A. L. R. 211; *Wishek* v. *United States F. & G. Co.,* 55 N. D. 321, 213 N. W. 488; 5 Ency. of Evidence, 706, 707.) There was, therefore, no error in permitting some of plaintiff's witnesses to estimate the number or numbers of trespassing horses and the proportion of the grass which they ate, or to estimate what proportion or percentage of such horses carried the defendant's brand.

In the course of the trial E. T. Butler, a witness for the ▮ plaintiff, was asked the following question on his direct examination: "What was the total amount of your expense, would you say, in trying to keep the stock off your lease during the time you had it?" Counsel for the defendant objected on the ground "that apparently part of the expense would be on account of horses not included in the issues in this case." The court then remarked: "That is understood,

but we cannot go out and count horses when they are by the thousands. Go ahead." It is now claimed the remark was prejudicial to the rights of the defendant. Counsel did not except to the remark at the time or ask the court to instruct the jury to disregard it. The court, however, in its general charge to the jury appropriately dealt with the matter. The defendant is not in a position to avail itself of the error, if such it was. (*Conway* v. *Monidah Trust*, 51 Mont. 113, 149 Pac. 711; *Loncar* v. *National Union Fire Ins. Co.*, 84 Mont. 141, 274 Pac. 844.)

We cannot see how under any stretch of the imagination the defendant was hurt because the plaintiff in the midst of the trial was allowed to amend the fifth cause of action by excepting sections 16 and 36 in each township from the description of what has been called the east Kuhr Land & Livestock Company lease of approximately 100,000 acres. The amendment could have only one reasonable effect, and that was to reduce the size of the verdict in the event the jury found the company was substantially damaged by the trespasses complained of in said count.

Defendant asserts with much vigor that the evidence failed to differentiate between the damages caused by its horses and the damages caused by the horses of others, and hence it was entitled to a nonsuit generally. According to modern authority, at least, such failure was not fatal to plaintiff's case. Where the injury occasioned by the tortious act of a defendant is indistinguishable from that arising from a like act of others, the approved practice is to permit the jury, as reasonable men, to make from the evidence the best possible estimate and to award the plaintiff compensatory damages for the injury. (*Watson* v. *Colusa-Parrot M. & S. Co.*, 31 Mont. 513, 79 Pac. 14; *Brown* v. *McCloud*, 96 Or. 549, 190 Pac. 578; *Hanlon D. & S. Co.* v. *Southern Pac. Co.*, 92 Cal. App. 230, 268 Pac. 385; *City of Colorado Springs* v. *Street*, 81 Colo. 181, 254 Pac. 440; *Pye* v. *Eagle Lake Lumber Co.*, 66 Cal. App. 584, 227 Pac. 193; *California Orange Co.* v.

*Riverside P. C. Co.,* 50 Cal. App. 522, 195 Pac. 694; 17 C. J. 756–761.)

The court instructed the jury that under certain circumstances they were at liberty to award the plaintiff exemplary damages. Appellant submits there was no evidence to support the instruction and assigns the giving of it as error. The instruction was too broad in its application, but, as the jury refused to allow exemplary damages, defendant suffered no prejudice. (*Martin* v. *Corscadden,* 34 Mont. 308, 86 Pac. 33; *Slifer* v. *Yorath,* 52 Mont. 129, 155 Pac. 1113.) We, however, believe the evidence justified an instruction to the effect that if the jury found from a preponderance of the evidence that servants of the defendant, while acting in the course of their employment, knowingly drove its horses on the leaseholds of Hill and the Millers, or on the leasehold of either of them, and were guilty of malice or oppression in so doing, then, in addition to the actual damages, if any, for the injury so done, they could, in their discretion, give damages for the sake of example, and by way of punishing the defendant. (*Luther* v. *Lee,* 62 Mont. 174, 204 Pac. 365; *Klind* v. *Valley County Bank,* 69 Mont. 386, 222 Pac. 439; *Grorud* v. *Lossl,* 48 Mont. 274, 136 Pac. 1069; *Burles* v. *Oregon Short Line R. Co.,* 49 Mont. 129, 140 Pac. 513, Ann. Cas. 1916A, 873; *Lahood* v. *Continental Tel. Co.,* 52 Mont. 313, 157 Pac. 639; *Jones* v. *Shannon,* 55 Mont. 225, 175 Pac. 882; *Mayo Hotel Co.* v. *Danciger,* 143 Okl. 196, 288 Pac. 309; 2 Sutherland on Damages, secs. 408–411.)

The witnesses Hill, Miller and Butler were competent to testify as to the reasonable expense of driving trespassing horses off their respective leaseholds. (*Tandy* v. *Fowler,* supra; 3 Jones' Commentaries on Evidence, sec. 1366; 2 Nichols on Applied Evidence, 2045, 2046; 17 C. J. 914, 915; 22 C. J. 592–594.) But it was not proper to permit them, over objection, to testify in a jumbled way respecting the cost of driving such horses off and of keeping them or other horses from coming on the premises and even, in one instance, of herding cattle for a season. In actions of this

kind the measure of damages is the amount which will compensate the party aggrieved for all the detriment proximately caused by the tort, whether it could have been anticipated or not. This, of course, may include both general and special damages. "General damages" are such as naturally and necessarily result from the act of which complaint is made. "Special damages" are such as are the natural, but not the necessary, consequences of that act. (*Sankey* v. *Chicago etc. Ry. Co.*, 60 Mont. 242, 198 Pac. 544.) The reasonable expense of keeping horses off the lands must be placed, if at all, in the category of special damages. But it is apparent that such expense did not flow from the actual trespasses; rather it was consequent on threatened trespasses.

The court instructed the jury on the theory that under the ▆▆▆ evidence the plaintiff could recover general damages, substantial in character, for the trespasses alleged in the third, fifth and sixth counts of the amended complaint. The record, however, does not disclose any evidence which shows, or tends to show, that so far as these trespasses are concerned the plaintiff is entitled to more than nominal damages. The verdict being for a lump sum cannot stand, as it is impossible to determine what amount the jury allowed for the wrongs claimed in any one of the five causes of action. (*Duckett* v. *Biggs*, 57 Mont. 443, 188 Pac. 938; *Luther* v. *Lee*, supra; *Walker* v. *Department of Public Works*, 108 Cal. App. 508, 291 Pac. 907.)

We deem assignments of error not covered by anything we have said of no importance.

The judgment is reversed and the cause remanded for a new trial.

Mr. Chief Justice Callaway, Associate Justices Angstman and Matthews, and Honorable John Hurly, District Judge, sitting in place of Mr. Justice Ford, disqualified, concur.

Rehearing denied February 15, 1933.