Bernard KIRSCH, Appellant,

v.

Milton L. HUBER and G. Edward Goodwin, individually and as co-partners doing business as Huber & Goodwin, George Barnes and S. R. Crawford, Appellees.

S. R. CRAWFORD, Appellant,

v.

Bernard KIRSCH, Appellee.

No. 15345.

United States Court of Appeals
Ninth Circuit.

Jan. 21, 1959.

Rehearing Denied Feb. 17, 1959.

David Livingston, Harold Farrow, James R. Mansfield, San Francisco, Cal., for Bernard Kirsch.

Lange & Rockwell, C. Dan Lange, San Francisco, Cal., for S. R. Crawford.

Philip C. Wilkins, Sacramento, Cal., for Milton R. Huber and G. Edward Goodwin, Hill & Hill, Clayton Janssen, Jr., Eureka, Cal., for George Barnes.

Before HEALY, POPE and HAMLEY, Circuit Judges.

POPE, Circuit Judge.

Appellant Kirsch, who was plaintiff below, and a citizen of the State of New York, owned a large quantity of standing timber located in Humboldt County, California. He entered into a contract in writing with the appellees other than Crawford, all of them citizens of California, which provided for the logging and sale of the timber. The general arrangement was that Kirsch should be paid a stated stumpage price on all logs sold; appellee Barnes was to manage the operations and cause the lands to be logged, and appellees Huber and Goodwin, who were members of a law partnership, were to collect the proceeds of the sales, pay the bills and keep the books. Profits on the operations were to be divided 37½% to Kirsch, 37½% to Barnes, and 25% to Huber and Goodwin.

The contract was executed on October 16, 1952, and logging was begun through the employment of various loggers who were engaged by the associates through Barnes. On June 23, 1953, all of the parties to that contract entered into a second contract in writing with appellee Crawford, a logging contractor, who agreed to "yard and load" specific varieties of timber which the associates should cause to be felled and bucked, and to "yard, load and peel" all redwood logs, payment to be made to Crawford at stated rates per thousand according to the scale of the mills to which the logs were to be delivered.

After operations under these two contracts had proceeded for some months, Huber and Goodwin, at the instance of Kirsch, notified Crawford by letter that the latter's contract was terminated. About the same time Goodwin, at Kirsch's direction, told Barnes that Kirsch wanted the logging stopped. This was in June, 1954. Barnes insisted that he had a contract under which he intended to proceed and the felling of timber continued. On August 4, 1954, Kirsch filed his action in the court below seeking an injunction against all of the parties to both contracts, restraining them from entering upon the land, from felling trees thereon, and from cutting and removing the same. All of the defendants filed separate counterclaims alleging breach of their respective contracts and seeking damages on account thereof. Barnes was awarded judgment against Kirsch in the sum of $45,492.20. Huber and Goodwin had judgment against Kirsch for the sum of $21,865.-90, and Crawford had judgment against Kirsch, Huber, Goodwin and Barnes in the sum of $24,485.30.

The appellant Kirsch presents separately his appeal from the judgments in favor of his former associates Barnes, Huber and Goodwin, and his appeal from

the judgment in favor of Crawford. We shall in like manner treat those judgments separately.

In respect to the contract of October 16, 1952, the contract between the former associates, Kirsch contends first, that the contract was terminable at his will and that he cannot be held liable for having brought it to an end; and second, that so far as the contract concerned Huber and Goodwin, it was made with these parties when they were acting as his attorneys in this and related matters, and that as such attorneys, they sustained a relation of trust and confidence with him; and that therefore the agreement between Kirsch the client, and Huber and Goodwin, the attorneys, whereby the latter were to obtain an advantage or profit, was presumptively invalid and presumed to have been obtained by undue influence on the part of the attorneys under the rule of California Civil Code §§ 1575 and 2235.[1] Hence, Kirsch says, he had a right to rescind the contract as between himself and the attorneys.

He contends further that this same right of rescission extended to Barnes since the latter was jointly interested with Huber and Goodwin. In any event, Kirsch says, even if the contract was not terminable at his will, he thought it was, and the others knew he had signed under that belief, and that hence he should be entitled to a reformation of the contract. He argues also that Barnes was in default under the contract and the court was in error in awarding the amounts of damages which it did.

We proceed to deal with these contentions in that order.

A reading of the agreement of October 16, 1952 indicates that it was not intended to be one terminable at will. Although Kirsch owned the standing timber on the lands referred to in the contract, the lands themselves had been conveyed to the State of California by his predecessors in interest who had reserved the timber thereon subject to a condition that it must be removed by May 4, 1958. It is clear that the contract was prompted by Kirsch's desire to assure disposal of the timber within that time. He had previously made unsuccessful efforts to sell it.

The contract bears on its face evidence that it was one designed to accomplish the complete logging of the stand which was referred to as the Prairie Creek timber. Thus the contract recites: "Kirsch agrees to permit the Prairie Creek timber aforesaid to be logged, commencing immediately, and as rapidly as good forestry practices and market conditions permit." It recites that: "Barnes agrees to immediately enter upon his duties, take full charge of the operations and cause the premises to be logged, devoting all time reasonably necessary to conduct the operations necessary in accordance with the best logging practices and so as to effect the best recovery therefrom."

The final paragraph of the agreement recites: "It is agreed that there is a period of removal of said timber, expiring on May 4, 1958, and Barnes agrees to so conduct the operation so that all merchantable timber will be removed from the premises before said date."

Since the logging of the property would constitute a business, and since the parties to the contract were to share the profits of this business, the arrangement would probably create a partnership under the provisions of the

1. "§ 1575. Undue influence—Undue Influence, What. Undue influence consists: 1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; * * *."

"§ 2235. Transactions between trustee and beneficiary; presumption—Presumption Against Trustees. All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence."

Uniform Partnership Act. See Cal.Corp. Code, §§ 15006, 15007. For the purposes of this decision we are not required to determine whether the association of the parties here was strictly a partnership or whether it should be designated as some other type of joint enterprise. Plainly enough the rules commonly applied in determining whether a partnership is one at will or for an agreed term would be applicable here in any event. Since the parties agreed that the arrangement had as its object the completion of a specified piece of work, the contract on the face of it was not terminable at will. The settled rule in respect to a partnership agreement is that "If the partnership has for its object the completion of a specified piece of work or the conduct of a business which obviously continues through a particular season, it will be presumed that the parties intended the relation should continue until the object had been accomplished." Quoted from 30 Cyc. 417 in Mervyn Inv. Co. v. Biber, 184 Cal. 637, 194 P. 1037, 1039.

The appellant's argument that the contract was intended to be revocable is based upon a certain circumstance which occurred at the time the contract was executed. The contract contains a sentence which reads: "Barnes shall be, and he is hereby designated, * * * the General Manager for the purpose of causing the said timber to be logged economically," etc. The contract was drafted by Goodwin on the instructions of Kirsch and Barnes and when first drawn and presented for signature, the sentence just referred to read: "Barnes shall be and he is hereby designated, ir-revocably the general manager for the purpose of causing the said timber to be logged economically," etc.

When the document so prepared was presented to Kirsch by Goodwin, Kirsch objected to the word "irrevocably" and thereupon the word was crossed out and the alteration was initialed by Kirsch, Barnes and Goodwin. There is no substantial dispute among the parties as to how that came about.[2] Apparently Barnes had signed the contract as originally drafted at an earlier occasion. Later when the change was called to his attention he too initialed the alteration by which the word "irrevocably" was stricken.

The substance of appellant's argument in this connection is that the uncontradicted testimony as to this cancellation of the word "irrevocably" requires a conclusion that all the parties manifested their intention that the contract was a revocable one, terminable at will, and that this was the purpose of that modification.

We think it is clear that the legal effect of the deletion of this word depends upon the parties' intention.[3] Differing inferences can be drawn from the evidence bearing on this point. On the one hand, if it was the purpose, as indicated, to sign an agreement for the completion and accomplishment of a specific objective, or piece of work, it could be argued that the indication that Barnes was not irrevocably the manager was hardly sufficient to defeat that general purpose. On the other hand, it would appear to be somewhat incongruous to contemplate that if Barnes were to be discharged as manager he would still go on drawing

2. Referring to Kirsch's reading of the document when presented to him, Goodwin testified as follows: "He—when he had finished reading the contract, he said to me, 'That is fine, except for one thing,' and he pointed out the word 'irrevocable' in the contract. I asked him why, and he said that the way we would make money on this operation was to log it diligently, that Barnes had a number of other interests, that if he did not perform the logging that we should have the right to put him out as manager. I told him I had no objections to that, that it was acceptable that the word be stricken out, and we drew a line through it and put our initials on it. There was I think one other change concerning some down timber. We initialled that, and he and I both signed the contract."

3. No question has been raised as to whether the oral conversation about this matter which preceded the final execution of the document was admissible under the parol evidence rule.

his 37½% of the profits under a continuing agreement.

We do not purport to set forth here all those parts of a very long record which furnished some evidence, pro and con, with respect to appellant's contention that the striking out of the word "irrevocably" was a manifestation of the parties' intention to make the whole contract terminable at will. To do so would serve no useful purpose for we hold that whether the deletion of that word had the claimed effect depends upon the intention of the parties at that time. And what their intention was is a question of fact.

 This question was determined by the trial court which found in its finding No. 6—"There was no mistake on the part of any of the parties to said contract as to the meaning of any part of said contract, and the contract was not intended to be nor was revocable at will. Kirsch had read and understood the said contract before it was signed." We find no basis for a contention that that finding was erroneous; and of course that finding precludes any possibility of a reformation of the contract.

It is next contended that if it be held that Kirsch executed a contract which was irrevocable and not terminable at his will then as between Kirsch, on the one hand, and Huber and Goodwin, on the other, his execution of the agreement must be presumed to have been procured by the undue influence of those attorneys under the provisions of the California Code mentioned above. (See footnote 1, supra.)

 That such presumption does exist in the case of contracts between client and attorney, and that it arises by virtue of both of those sections has frequently been declared by the California courts. See In re Witt's Estate, 198 Cal. 407, 245 P. 197; Cox v. Delmas, 99 Cal. 104, 33 P. 836; Bradner v. Vasquez, 43 Cal.2d 147, 272 P.2d 11.

Appellees contend that this presumption was fully rebutted and that the court was justified in finding that there was no undue influence used or exerted to induce Kirsch to enter into the contract. In this connection appellees point to the testimony of Kirsch himself showing that he was a man of very considerable business and financial experience. He had had a substantial restaurant business in Florida for some 12 years. Later, and after 1945, he had gone to Eureka, California, where as president and treasurer of the Grizzly Park Lumber Co. he had supervised the expenditure of some five million dollars in timber and lumber operations through deals which he himself handled with carte blanche authority. In 1950 he acquired the Prairie Creek timber from the company for the sum of $625,000 and proceeded to log it. The trial court's opinion refers to Mr. Kirsch in this connection as "an experienced, intelligent, capable, understanding business man."

It is also noted that Kirsch was fully aware of the fact that there was a possibility that he might lose the right to log this timber by default if he did not get it out by May 4, 1958. The arrangement into which he entered when he signed this contract was designed to furnish him security against this possibility of loss. He knew Barnes well. Barnes had acted as his broker in sundry attempts to sell the property. These efforts had been unsuccessful; but he also knew that Barnes had had substantial experience in carrying on logging operations, and the record is sufficient to support a finding that Kirsch had a high regard for Barnes' ability in that respect. Kirsch and Barnes first talked over the proposed arrangement and it was they who invited Goodwin to participate as the third man active in the joint enterprise.

While the proposed arrangement was still in the discussion stage between Barnes, Kirsch and Goodwin, Kirsch requested Goodwin to consult one Hefter, an accountant, respecting the tax aspects of the proposed contract. Goodwin did this, and as Hefter testified, he approved the arrangement. Goodwin then proceeded to draw the document which became the agreement.

The record contains evidence showing what work Goodwin was required to and did perform under the contract which required Huber and Goodwin to make all collections for logs sold, to pay the bills, and to keep the books. The evidence in this respect was sufficient to warrant the court's belief that Goodwin earned his money. The court was also justified in a belief that the transaction was not an improvident one so far as Kirsch was concerned, for the $8.50 per thousand stumpage price he received under the contract was somewhat more than the going prices for similar standing timber. In addition, the enterprise as a whole was successful and paid Kirsch as well as the others a substantial profit over and above the stumpage payments and the operation expenses.

It is Kirsch's contention that the presumption of undue influence is reinforced by evidence of certain respects in which Goodwin failed adequately to represent or act for Kirsch at the time the contract was ready for execution. The principal complaint in this respect is that Goodwin failed to inform Kirsch at the time the word "irrevocably" was stricken from the contract, that notwithstanding that alteration Kirsch could not terminate the enterprise at his will; and that Goodwin should have known from what Kirsch said at that time that he, Kirsch, contemplated that the arrangement would be terminable at any time;—hence, that Goodwin allowed his client to sign a contract which he misunderstood.

Emphasis is also placed upon the fact that Huber and Goodwin knew that the State of California was even then dickering for the purchase of this timber and that there were reasonable prospects that Kirsch might be able to realize on the timber by a simple sale to the State. Notwithstanding this, appellant says Goodwin failed to insert an appropriate provision in the agreement which would permit Kirsch to take advantage of an offer from the State if he got one. Goodwin also prepared the contract between the associates on the one hand and Crawford on the other which was executed June 23, 1953, and which provided for logging by Crawford. This also had no provision in it to permit Kirsch to take advantage of an offer from the State. (The State did on November 17, 1953 agree to purchase the timber for a price of $287,500.)

Kirsch also charges Huber and Goodwin with misconduct in that an attorney in their employ appended a certificate to the agreement falsely certifying that Kirsch had in his presence acknowledged the execution of the agreement. This it is said enabled Barnes to place the contract of record on September 11, 1953 at a time when it began to look as if Kirsch would get an offer from the State of California for timber.

The question before us is whether the court, after considering all of the circumstances bearing upon the question whether the presumption of unfair influence was or was not rebutted, was justified in making its finding in favor of Huber and Goodwin. The drawing of an appropriate inference from all these facts would appear ordinarily to be a part of the process of making that finding. If a finding either way is permissible under the evidence, then it would not be appropriate for this court to substitute its findings for those of the trial court unless the latter can be said to be clearly erroneous.

The principal point in which appellant asserts the court's findings were clearly erroneous and against the law, has to do with the failure of Goodwin at the time the contract was signed by Kirsch either to tell him that notwithstanding the deletion of the word "irrevocably" the contract was not a terminable one, or to see to it that the client Kirsch had independent advice from others respecting the legal significance of the contract.

Appellant contends that in order to rebut the presumption against the attorney, there must be proof that the attorney had given his client the advice which the client would have received if he had employed independent counsel; that the attorney must prove that he gave "all that

reasonable advice against himself that he would have given him against a third person." Appellant cites in support of this position Felton v. Le Breton, 92 Cal. 457, 28 P. 490, In re Witt's Estate, supra, and Cox v. Delmas, supra. Goodwin conceded in his testimony that he had never advised Kirsch to get independent legal counsel as to the desirability of entering into this legal transaction.

The question narrows down to this: Does the fact that Kirsch did not have independent advice require a finding that the presumption of undue influence was not rebutted?

We think the answer is to be found in Munfrey v. Cleary, 75 Cal.App.2d 779, 171 P.2d 750, 753, and the cases there cited. Discussing this precise question, the court there said: "But even if we were to assume, as appellant contends, that the allegations of the complaint are sufficient, and that the evidence shows that the relationship of attorney and client existed at the time the deed was executed and that appellant did not have independent advice, such facts do not establish conclusively that appellant was acting under undue influence of his attorney. The presumption which arises under such circumstances, though it casts upon the attorney the burden of overcoming it by clear and satisfactory evidence, is disputable; *and the fact that the client may not have had independent advice is but a circumstance."* (Emphasis added.)

The California Supreme Court indicated its approval of this statement of the California rule in Bradner v. Vasquez, 43 Cal.2d 147, 272 P.2d 11, 15. In that case the court affirmed a judgment in which it was held that a certain employment contract obtained from his client by an attorney was unenforceable because the statutory presumption of undue influence had not been rebutted by contrary evidence. The court there said: "Such evidence of plaintiff, tending to show that there was no undue influence, conflicts with the presumption of undue influence. The fact that defendants

never had any independent advice is also a circumstance of undue influence."

Both the Munfrey case, supra, and the Bradner case just cited, referred with approval to Brown v. Canadian Industrial Alcohol Co., 209 Cal. 596, 289 P. 613, 614. The Bradner case also cited the Munfrey case. The Brown case involved the application of Civil Code § 2235 to the trustee-cestui relationship where a gift had been made to the trustee by the cestui. The trial court had upheld the validity of the gift notwithstanding the statutory presumption. The appellant contended that proof that the cestui had independent advice at the time of the gift was indispensable in order to rebut the presumption of undue influence. The court said: "Appellant makes much of the fact that she had no independent advice in reference to the transaction. In some early cases of this court, where the factual situation was particularly aggravating, expressions may be found, when considered separately and without reference to the text, which imply that independent advice is essential to the validity of such a gift. [Cases cited.] But those cases were never intended to hold that independent advice was indispensable. We are in accord with the rule that, where a fiduciary relationship exists between the donor and donee, the absence of independent advice is a circumstance to be considered in determining whether the gift should be avoided because of alleged undue influence or fraud, but its nonexistence alone does not authorize the court to avoid the gift. All utterances to the contrary have been squarely repudiated by this court."

 In the light of these decisions we feel we are obliged to hold that the findings of the court below to the effect the attorneys Huber and Goodwin did not use or exert any undue influence to induce Kirsch to contract with them cannot be said to be clearly erroneous. As the cited California cases hold, the absence of independent advice from other attorneys is only one circumstance which the court may properly consider in determining whether there was undue in-

fluence. Independent advice is not indispensable. Nor was it essential that Goodwin tell Kirsch, item by item, the legal meaning of each provision in the contract. Kirsch was an experienced business man and the trial court could justifiably believe and find that when he read the contract which he signed he knew that it contemplated the continuation of the enterprise until the completion of the specified project.

■ Since the facts here are such that Huber and Goodwin, the attorneys, may enforce the contract, it is obvious that Barnes, although a person jointly interested in the contract with Huber and Goodwin, is not debarred from asserting rights under the contract by virtue of any presumption of undue influence.

### The Appeal From the Crawford Judgment

Kirsch argues that the judgment in favor of Crawford and against Kirsch and his associates should be reversed, so far as Kirsch is concerned, on the ground that the evidence showed that Crawford did not perform his contract for logging but was in default thereunder. The contention is that these breaches on the part of Crawford were substantial so as to bar his recovery.

The court found that although Crawford did not maintain the daily average production of 60,000 feet as required by the contract, yet there was substantial performance on his part. He was awarded damages in the sum of $24,485.30.

To understand the basis for the court's findings with respect to the Crawford contract, it is necessary to refer to that agreement's provisions. Mr. Crawford was referred to as "logger", yet the contract did not provide for performance by him of all the operations which had to be carried out in order to log the area in question. Kirsch and his associates were required under the written contract to perform a substantial part of those operations themselves, and it is plain that some of those had to be carried out before Crawford could do his part. Thus the associates were to construct the road leading from the state highway to the first logging landing. While additional roads were to be constructed and maintained by Crawford, it was necessary that the bulk of the logs taken out move over the road for which Kirsch and his associates were responsible. In addition Kirsch and his associates were to do the falling and bucking, that is to say, they were to cut down the trees and cut them into log lengths. Finally, Kirsch and his associates had the responsibility of obtaining the trucks to do the hauling and of seeing to it that the logs were hauled to the mills where they were sold. The contract did provide that if Kirsch and his associates could not obtain adequate trucks then Crawford had the right to put on his own trucks or employ independent truckers in which event he was to be paid a larger sum. However, he was not obliged to adopt this alternative, at least not until he could ascertain whether the associates were able to carry out their obligation in this regard.

It is also true that by a separate and distinct agreement, Crawford was employed by the associates to perform some work on the portion of the road which they were to construct from the highway to the first landing. This, however, did not alter or modify the main contract under which the associates remained responsible for that road.

What Crawford was required to do was to peel the redwood logs, skid all logs to a landing, (called "yarding") and load the logs on trucks. While Crawford did agree to produce an average daily production of not less than 60,000 feet, that obligation was subject to some qualification in view of other provisions of the contract. Thus Crawford's agreement was to commence operations "as soon as * * * weather permits." He agreed to use his best efforts to do this work in the calendar year 1953, "but in the event of unfavorable weather or other reasons prohibiting him from completing said logging in 1953, he agrees to resume logging upon the property as soon as weather permits in the spring of

1954 and to thereafter complete the same as rapidly as can be done."

It is clear that under the provisions of this contract and the conditions relating to the acts to be performed by the associates, it is impossible to charge Crawford with default merely because he failed to produce the 60,000 foot average daily amount mentioned in the contract. There was substantial evidence that the road which the associates were to provide was inadequate and insufficient and that the necessary trucks were not always available. The evidence indicates that procuring them was at times impossible because of a general strike on the part of truckers in the area who refused to operate because of their objections to certain state weight requirements.

But whatever the reason for the nonsupply of trucks, it seems plain that Crawford was not responsible therefor, for he had no fixed obligation in respect to them. There was substantial evidence to indicate that Crawford's work was slowed by the manner in which the felling occurred and that at all times he had logs at the landing ready to load and equipment sufficient to load them. It is plain that the contract did not contemplate operations during unfavorable weather and there was plenty of evidence of adverse weather conditions which had its effect in making the principal road to the highway inadequate. The court found that Crawford's logging operations "were conducted in line with similar types of operations in Prairie Creek Area."

Finally, Crawford's performance was terminated by the filing of the action and the issuance of a temporary restraining order which brought his operations to an end. This, the court held, was a wrongful breach of the contract on the part of Kirsch.

We cannot hold these findings to be erroneous.

## Questions Relating to Damages

In awarding damages to Barnes, Huber and Goodwin, the court included loss of profits due to the Kirsch termination of operations.[4] It also added portions of the purchase price paid by the State of California for the timber acquired by it after Kirsch terminated the contract.

Appellant argues that these parties should not have been awarded these sums based on the proceeds from the sale to the State of California for the reason that since the State acquired this timber that acquisition prevented the further performance of the contract; hence, it was a case of commercial frustration for which Kirsch could not be held to be responsible.

We think that the short answer to this is that the State acquired the timber not as a result of condemnation or any unilateral action on its part, but as a result of Kirsch's voluntary and negotiated sale. It is apparent that the amounts awarded from this to Barnes and Huber and Goodwin were not in proportion to their percentages under the contract. They were very much less.[5] We cannot say, on this record, that the court was in error in making this allowance, for some profits would have accrued to Barnes, Huber and Goodwin from logging this timber had the contract not been terminated and the timber sold.

Finally, Crawford has himself appealed from the judgment as against Kirsch only, submitting that the court should have awarded him greater damages. He states his position as follows: "If the issue of damages must be retried as against the cross-defendant, Kirsch, it is respectfully submitted that the trial

---

4. It also included the shares of Barnes, Huber and Goodwin, in moneys on hand which had been collected from sales of timber at the time the contract was terminated, and the value of the shares of Barnes, Huber and Goodwin in timber which had been felled and bucked at the time the contract was breached.

5. Of the total payment of $287,500, $16,-000 was awarded to Barnes and $10,000 to Huber and Goodwin.

court erred in not awarding greater damages to Crawford."

The condition thus stated, as this opinion discloses, has not and will not occur. We need not arrive at any conclusion as to whether by this quoted language Crawford means to say that if there is not to be a new trial he will not urge this point. We cannot find that the amount of damages awarded to Crawford were too small. It is elementary that where loss of profits from breach of contract is considered by a trial court, that court must be permitted some leeway in ascertaining and calculating what those damages amount to. Cf. California Orange Co. v. Riverside Portland Cement Co., 50 Cal.App. 522, 195 P. 694. We hold that there is no occasion for modifying the award of damages made to Crawford.

The judgment is affirmed.