GREAT AMERICAN INSURANCE COMPANY, a corporation, Subrogee of Patton and Linton, Inc., Plaintiff,

v.

"QUICK-WAY" TRUCK SHOVEL CO., a corporation, Defendant.

Civ. A. No. 7060.

United States District Court
D. Colorado.

May 15, 1962.

J. Bayard Young, Denver, Colo., for plaintiff.

John P. Beck, Denver, Colo., for defendant.

DOYLE, District Judge.

The above-entitled case was tried to the Court on May 7 and 8, 1962. It was originally instituted by the American Insurance Company seeking a "recovery over" from "Quick-Way" Truck Shovel Company and Aetna Insurance Company, its insured, in the amount of $45,000.00. This sum of money was paid out by plaintiff to one Lawrence Elliott, a workman who suffered a personal injury in connection with the operation by Patton and Linton of the Quick-Way crane. Plaintiff maintains that the ultimate liability is that of "Quick-Way" in that it violated a duty to plaintiff arising out of a warranty, express or implied, or

negligence. The claim against Aetna Insurance Company was dismissed before trial.

The injury occurred on November 14, 1956. It resulted from the failure of a crane which was then being operated on a construction job in Pocatello, Idaho. Elliott was an employee of the building contractor and just before the failure he had been standing on a form in which concrete was being poured. The crane was being used to transport the concrete from a concrete truck to the form. The special basis upon which plaintiff seeks to recover arises from the furnishing of one-half inch bolts by "Quick-Way" for a repair which had been made several months prior to the failure. It is contended that ordinary hardware bolts were furnished and that because of their weakness they sheared, causing the failure and the injury.

The crane operator was one O'Connor, whose regular employment was as a truck driver, but who was shown to have occasionally operated this crane and to have had some previous experience in operating similar equipment. Prior to November 14, he had been assigned to the job of operator for only a few days and had actually operated the crane twice previous to November 14. Just prior to the happening, concrete was being moved from the truck to the forms which were located some 30 to 35 feet from the cab of the crane. At the time of the injury the boom was extended to a distance of almost 35 feet and was on an upward angle. The position of the crane was such that the concrete had to be moved in an arc of 180° from the truck to the form. The load in the "bucket" was approximately 2500 pounds. Just prior to the collapse the boom was over the form and the bucket was being moved into position —it was just a few feet above the form when the collapse occurred. Elliott, who had been standing on the form guiding the bucket to the correct point, was just under the boom. The sudden failure resulted in the boom's hitting Elliott a glancing blow on his left side, knocking him off of the form. He suffered severe head, back and rib injuries.

After the accident the crane was disassembled and it was discovered that the six bolts which attached the worm gear to the hub of the drive shaft, had sheared. This had resulted in freeing the shaft, causing the boom to descend rapidly and producing the injuries.

The crane, which is of Quick-Way's manufacture, is described as a "Quick-Way" Power Down Boom Hoist, worm driven, model L. It has a 45-foot boom when fully extended. Its workings are described in the Manual, exhibit 53, and were explained by O'Connor and the previous operator, Gambles.

The previous replacement of the bolts which plaintiff claims produced the failure, occurred in April, 1956, some months prior to the happening. At that time it was discovered that two of the bolts from the same area which later failed in November, had broken, or sheared, and required replacement. The crane was disassembled and was out of action for a period of two weeks or ten days. A specific order was made to a local supplier from a Quick-Way Truck Shovel Company catalogue. This catalogue described and pictured the bolts needed for the particular purpose. They were called PB-113 bolts. Plaintiff's evidence established that following the order the bolts were sent in a small package by Parcel Post. They were received by the dispatcher who delivered them to a Mr. Patton, who in turn delivered them to the mechanic, one Bentel, who in turn installed them. Gambles was the operator of the crane during the entire period between April and November, and he testified that this was the only repair job which was made during the period and that no other bolts were installed.

Defendant's testimony on this point was that the invoice showed that PB-113 bolts were furnished and its witnesses denied that the hardware bolts of the type which were found after the failure, were carried in stock. Further testimony showed, however, that bolts of similar dimensions were carried by Quick-

Way, but were kept in a different bin from that in which the PB-113 bolts were kept. Bentel, the mechanic who installed the bolts, described them as dark in color, rather than shiny. The sheared bolts were of the latter type. There was a great deal of evidence as to the qualities of PB-113 bolts. These were shown to be heat and carbon treated and to have one hundred per cent. more strength than the ordinary hardware bolts which were found to have been installed.

Defendant also sought to establish that the crane was not properly operated. Testimony of Elliott was that the boom was being maneuvered at a low level thus placing more strain on the parts and that it was extended to such great extent that the cab was lifting off of the ground. He characterized the operation as "jerky" and "reckless."

Defendant also brought out that the brake which stopped the boom when it was moving downward was not working properly. Normally, release of a hand lever would move a so-called "dog" to engage a gear which would immediately stop the crane. However, this brake had not been working for some two years and the operators had been reversing the power from downward to upward in order to bring the boom to a stop. Defendant also emphasized that the pictures of the worm gear showed that it had had some non-factory work performed on it. The six holes into which the bolts in question attached the worm gear to the hub showed various markings indicating uneven torquing. From these photographs it also appeared that inserts, or bushings, had been placed in these holes, no doubt as a result of wear. According to defendant this would effect an uneven attachment.

Engineers on behalf of both the plaintiff and defendant testified to the effect of hardware bolts as against the PB-113, specially treated bolts. The former are much softer and are thus conducive to uneven torquing. Furthermore, the hardware bolts are much less capable of tolerating stress and strain, the PB-113 bolts being one hundred per cent. stronger.

Plaintiff's engineer gave as his opinion that the failure was caused by the inability of the hardware bolts to absorb the stress and strain. Defendant's engineer testified that the hardware bolts, had they been properly adjusted, had ample strength and resistance to carry the load. He stated in answer to a question from the Court, that even if improperly installed, the PB-113 bolts would have been much more capable of holding the load—that two or three of such bolts could have held the load.

■ 1. The first fact question is whether the bolts which were furnished by the Quick-Way Company in 1956 were the identical bolts which were installed in the crane at the time of its failure.

The evidence as to this is not entirely satisfactory. Nevertheless, the probabilities favor the conclusion of fact that defendant furnished the wrong bolts. Although defendant argues that the chain of evidence is insufficient and inadequate, the evidence appeals to the Court as being sufficient. Certainly, Patton and Linton made every effort to obtain bolts specified in defendant's parts catalogue. The equipment was out of action for a period of time while these bolts were ordered. Had they been willing to install hardware bolts, this would have been unnecessary. The evidence established that the specific order was sent and that delivery of what purported to be PB-113 bolts was made. The bolts which were furnished were installed. Finally, the evidence is that this was the only installation during this period of time.

Against this chain of evidence are the denials of the defendant plus the circumstance that the mechanic described the bolts as being dark in color giving full weight to the statements of defendant that PB-113 bolts were carefully isolated. It seems more probable, in view of the evidence before the Court, that somehow a mistake was made and the wrong bolts were shipped and were installed.

■ 2. The second factual question is whether the furnishing of the

wrong bolts constituted a factual cause of the ultimate failure. The answer to this question involves legal as well as factual analysis. A force is a factual cause of a consequence if it can be said to be a substantial factor in bringing about the harm. See Restatement of Law of Torts, section 432, Prosser on Torts, 2d ed., pp. 220, 221, 222. Restatement, supra, declares:

"(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if it would have been sustained even if the actor had not been negligent.

"(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be held by the jury to be a substantial factor in bringing it about."

Can it be said that the harm would have occurred even if the defendant had not been negligent or in breach of warranty? In other words, if PB-113 bolts had been installed, would the failure have nevertheless occurred? The testimony is persuasive that PB-113 bolts would have prevented the failure. Even the testimony of defendant shows that these carbon-treated and heat-treated bolts were substantially stronger than ordinary hardware bolts, so much stronger that even two or three of such bolts, according to defendant's own testimony, would have held the load. Moreover, there is less likelihood of overtorquing when these hard bolts are in use; in fact, defendant Quick-Way offered no special instructions regarding torquing, and if hardware bolts had been used this would have been of prime importance. Tested, therefore, by the "but for" or *sine qua non* rule, it must be concluded that the presence of the hardware bolts was in fact and in law the cause of the failure. The furnishing of inferior bolts was a necessary antecedent of the harm.

3. The third fact question is whether acts of the plaintiff intervened as causes.

It may well be that the plaintiff should have discovered that the wrong bolts had been sent at the time of the installation. It should be noted, however, that a special order was sent and that particularly described bolts were delivered. Thus, plaintiff was not required to anticipate that defendant had possibly made a mistake.

Was faulty operation shown to have been a cause? The evidence on this is not persuasive. It came from the injured person whose outlook was, to say the least, somewhat bitter, and his description as to what occurred cannot be channeled, or pinpointed so as to furnish a logical explanation for what occurred.

Could the failure have been averted by having the brake in repair? According to Gambles, who had operated the crane for some period of time, the absence of the brake controlling the downward booming did not endanger the operation. He also said that O'Connor, who was operating the crane on the day in question, knew about this. Quite apart from these factors however, it seems clear that the presence or absence of brake had no substantial effect upon the falling of the boom because the boom was so close to the form and to Elliott at the time of the failure that it is manifest that taking into account application time and reaction time the "dog" could not have engaged the gear so as to avoid the boom's hitting Elliott.

It must be concluded, therefore, from a consideration of all the evidence that the efficient and proximate cause of the failure, from a factual standpoint, was the presence of bolts which were susceptible to being sheared under the stresses and pressures to which they were being subjected. It is inconceivable that the manner of operation could be a factor. This kind of equipment is certainly designed to withstand heavy stresses and pressures and it should not give way because of jerky operation.

## I.

### NEGLIGENCE, OR BREACH OF WARRANTY

██ The principle that a manufacturer supplying a chattel owes a duty to the ultimate consumer for injury occasioned by his negligence or breach of warranty in supplying the article is now well recognized. Its application is particularly clear where the product creates a high degree of hazard to third persons. See MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696; Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R. 2d 1; Restatement of Torts, Section 388. The furnishing of defective (for the purpose) or inadequate bolts for use in a crane would certainly be governed by this doctrine because the danger, or hazard to the user or to persons in the vicinity of its use, is clearly present. In the case at bar Quick-Way could be said to have owed a duty to Elliott, a workman, and to have violated that duty by furnishing materials which created a hazard of injury. Had Elliott pursued his action against Quick-Way, the latter would have been held liable to him.

## II.

### PLAINTIFF'S "ACTION OVER" AS CONTRIBUTION OR INDEMNITY

██ Defendant contends that even assuming that its negligence or breach of warranty is established, nevertheless plaintiff can not recover from it because plaintiff itself was negligent and thus the parties are in *pari delicto* and the rule which precludes one tortfeasor from recovering from the other is fully applicable. See 13 American Jurisprudence 33, Section 36, Contribution. It is to be noted here, however, that plaintiff did not participate in the original wrongful act of furnishing defective bolts and it is equally familiar doctrine that even a negligent plaintiff can recover from one who is shown to have been primarily responsible for the harm. Such a recovery can be had under the principle of *indem-nity* as opposed to contribution. Otis Elevator Co. v. Maryland Casualty Co., 95 Colo. 99, 33 P.2d 974; Colorado & Southern Ry. Co. v. Western Light & Power Co., 73 Colo. 107, 214 P. 30; Publix Cab Co. v. Fessler, 138 Colo. 547, 335 P.2d 865, 75 A.L.R.2d 979; Atcheson, Topeka & Santa Fe Ry. Co. v. Hadley Auto Transport, 192 F.Supp. 849 (D.C. Colo.1961).

In Parrish v. De Remer, 117 Colo. 256, 187 P.2d 597, 605, the Colorado Court considers the applicable criteria as follows:

"While in Colorado & Southern Railway Co. v. Western Light & Power Co., supra, it was determined that both defendants were guilty of negligence respecting the rights of plaintiff Hoyle, nevertheless defendants were entitled to litigate and have a judicial determination of the question as to the negligence of which one thereof was solely, primarily and proximately the cause of the injury upon which the judgment was based. In the instant case the position of plaintiffs here is much stronger than was that of the light company in Colorado & Southern Railway Co. v. Western Light & Power Co., supra, and more nearly comparable to the factual situation in Otis Elevator Co. v. Maryland Casualty Co., supra, for the negligence, if any, of defendants here has never been judicially determined, and if plaintiffs are able to establish to the satisfaction of the court, or a jury, by a preponderance of evidence that defendants, although not heretofore a party to any litigation in which plaintiffs have been involved, were *solely, primarily* and *proximately* the cause of the accident for which plaintiffs were mulcted in damages, plaintiffs are entitled to indemnification."

In Atcheson, Topeka & Santa Fe Ry., supra, this Court, speaking through Chief Judge Arraj, recognized the general principle as follows:

"One exception to the general rule prohibiting indemnity among tortfeasors and recognized by the Colorado courts is that which allows a party secondarily or incidentally liable to recover from the party primarily liable. * * * "

 Thus, if it can be said that defendant's conduct was the *sole, primary, proximate* cause of the harm, the plaintiff may maintain an "action over" for indemnity or restitution, notwithstanding that plaintiff's subrogor was negligent in relation to the injured person, Elliott.

## III.

### RIGHT OF INDEMNITY AS AGAINST MANUFACTURER

A special aspect of the indemnity doctrine is that applicable to manufacturers, suppliers and contractors. Restatement of the Law of Restitution, section 93; Prosser, Law of Torts, 250 (2d ed. 1955); Popkin Bros. Inc. v. Volk's Tire Co., 20 N.J.Misc. 1, 23 A.2d 162; Pfarr v. Standard Oil Co., 165 Iowa 657, 146 N.W. 851, L.R.A.1915C, 336; Busch & Latta Paint Co. v. Woermann Const. Co., 310 Mo. 419, 276 S.W. 614; John Wanamaker, New York, Inc. v. Otis Elevator Co., 228 N.Y. 192, 126 N.E. 718; Miller v. New York Oil Co., 34 Wyo. 272, 243 P. 118.

 An annotation in 37 A.L.R. 853 treats a closely analogous proposition—the right to indemnity against a manufacturer, or vendor, for liability incurred under workmen's compensation law for injury to employee caused by defective machine. This is a note to Dayton Power & Light Co. v. Westinghouse Electric & Mfg. Co., 6 Cir., 1923, 287 F. 439. The Restatement of Restitution section, supra, contains a good statement of the applicable principle:

"(1) Where a person has supplied to another a chattel which because of the supplier's negligence or other fault is dangerously defective for the use for which it is supplied and both have become liable in tort to a third person injured by such use, the supplier is under a duty to indemnify the other for expenditures properly made in discharge of the claim of the third person, if the other used or disposed of the chattel in reliance upon the supplier's care and if, as between the two, such reliance was justifiable."

It is also noteworthy that in comment (d) to Section 93 the authors indicate that the claimant is barred only if he was reckless in the use of the chattel, or if he suspected that the supplier had not properly performed, or that the chattels were defective. No such evidence is present in the case at bar.

 It is also noteworthy that the emphasis in Section 93, supra, is on the reliance factor. Did the claimant rely on the care and ability of the manufacturer? There is evidence to support a conclusion that such reliance was here present since plaintiff ordered the bolts from a catalogue of defendant. It must be concluded, therefore, that the instant case is a proper one for the application of the doctrine of indemnity. The conduct of the defendant looms as the primary and efficient cause of the injury and thus it follows that defendant must be held responsible.

## IV.

### AMOUNT OF DAMAGES

 As a part of its case plaintiff introduced testimony of Elliott as well as that of his doctors to show that his injuries were severe and that they are permanent. Elliott was at the time of the injury just under fifty years of age and he has substantial life expectancy. He had very substantial loss of earnings and of earning power, which loss will continue during the remainder of his life, and in addition had large medical, doctor and hospital bills. He also had a substantial claim for pain and suffering. In the light of this evidence the Court is convinced that the $45,000.00 settlement was fair and reasonable. It follows that the plaintiff has adequately established

this aspect of its case and the amount of its recovery should be $45,000.00. The matter of attorney's fees and costs of litigation were not taken up at the trial and need not be considered here. It is, therefore

ORDERED, ADJUDGED AND DECREED that judgment be entered in favor of the plaintiff and against the defendant in the amount of $45,000.00, together with costs expended in this action.

It is believed that the findings and conclusions are sufficiently set forth herein and that formal findings and conclusions are unnecessary. Plaintiff will prepare a formal judgment for the Court's signature.