382 F.2d 395
 SPEED FASTNERS, INC., a corporation, now doing business as the Speed Fastners, Inc., a foreign corporation, a division of Elco Tool and Screw Corporation, Appellant,
v.
Ray NEWSOM and American Employers Insurance Company, Appellees.
 No. 8827.
 United States Court of Appeals Tenth Circuit.
 September 26, 1967.
 
 Paul C. Duncan, Oklahoma City, Okl. (Robert S. Baker and Pierce, Duncan, Couch & Hendrickson, Oklahoma City, Okl., of counsel, on the brief), for appellant.
 Don Manners, Oklahoma City, Okl. (James D. Grigsby, Oklahoma City, Okl. of counsel, on the brief), for appellees.
 Before WILBUR K. MILLER*, LEWIS, and BREITENSTEIN, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 The jury awarded appellee-plaintiff Newsom $100,000 in damages for injuries received in an industrial accident occurring in Oklahoma. A fellow workman was using a powder-loaded gun to drive studs through a steel I-beam for the purpose of attaching a 2 × 6 piece of wood thereto. The head and shank of the stud separated with the shank ricocheting out of the wood and striking the plaintiff. Suit was brought against the manufacturer of the stud, appellant-defendant Speed Fastners, Inc., on the theory of breach of both express and implied warranties. Jurisdiction is based on diversity.
 
 
 2
 Plaintiff was a carpenter foreman employed by Oak Creek Development Company in the construction of an Oklahoma City motel. On the day of the accident plaintiff adjusted the gun and gave it to a fellow employee, Gilbert Hensley, for use. Hensley had difficulty in getting the desired penetration and changed to a heavier powder charge and a shorter plunger setting. The effect of these changes was to increase the driving force of the gun.
 
 
 3
 The ricocheting shank of the stud hit plaintiff in the abdomen and lodged in a nerve center of the pelvic region. According to the medical testimony, it cannot be removed safely. The gun used by Hensley was a "Ramset" which is manufactured by a competitor of defendant Speed Fastners. The powder charge was contained in "Omark" cartridges, the product of another manufacturer. No claim is made by either party of a defect in the gun or the cartridge.
 
 
 4
 Speed Fastner asserts that the evidence does not establish that the stud which separated was manufactured by it. Both Ramset and Speed Fastner studs were used on the job and in the area where Hensley was working separated heads of both types were found. On the day of the accident a quantity of Speed Fastner studs had been delivered to the employer. Plaintiff testified positively that Hensley was using Speed Fastner studs. Hensley did not say what brand he was using. He said that the studs and shells were brought out to him and that he put them in the nail pocket of his apron. He described the studs thus:
 
 
 5
 "There's some that's an inch-and-a-half nail, that there was a — in a red and white box, and they had a little plastic affair around them to keep them from going — a little white plastic farrow [ferrule], to keep them from going through the gun."
 
 
 6
 Speed Fastner studs come in a red and white box. No showing was made of the type of box for Ramset studs. Speed Fastner studs have a white plastic ring or ferrule around the shank about midway between the head and the point. Ramset studs have a red plastic cap which covers the point and extends a short distance up the shank. Although the plaintiff's self-serving statement may be suspect, it finds support in the quoted testimony of Hensley. Taken together, they amount to more than a scintilla and are sufficient to justify the submission to the jury of the question of identity of the stud. The jury resolved that issue in favor of the plaintiff and we cannot say as a matter of law that the verdict was wrong in this regard.
 
 
 7
 The plaintiff's theory is that the manufacturer of the stud is liable under either an express or an implied warranty. The court submitted the case to the jury on each theory and specifically instructed that the plaintiff need not prove negligence on the part of the manufacturer.
 
 
 8
 On the question of express warranty, the evidence is that, prior to the accident, some unknown person gave to the plaintiff a copy of a pamphlet which was issued by the manufacturer and which described certain of its products. Failure to prove agency of the distributor of the pamphlet is said to be unimportant because the pamphlet was an advertisement to the public and, hence, within the modern concept of express warranty.[1] The point is unimportant because the representations were made to the plaintiff — not to the purchasing employer. There is no showing that the plaintiff had or exercised any control or right of suggestion over the purchase of studs. He supplied his crew with the studs furnished by the employer.
 
 
 9
 In any event, the record does not establish a breach of an express warranty as the cause of the accident. The plaintiff relies on statements in the pamphlet that there is an elimination of the possibility of an overdriven stud and of the possibility of a ricochet. Such statements in the pamphlet refer to a "Safti-Flite Speed Fastner" gun — not to the studs. The only pertinent references to the studs are that they are "aus-tempered" and "tested by Pittsburgh Testing Laboratory." The studs were made of "Tempered Martensite." The terms "aus-tempered" and "Tempered Martensite" refer to a manufacturing process. There is no evidence that one process is better than the other. The studs were not tested in the Pittsburgh Laboratory but no connection is shown between the lack of such testing and the separation of the head and shank of the stud.
 
 
 10
 Oklahoma has the Uniform Commercial Code. It provides that express warranties are created by an affirmation of fact or promise which becomes a part of the bargain and by a description of the goods which is made a part of the bargain.[2] The plaintiff did not buy the studs. Nothing shows that the employer when purchasing the studs relied on any statement in the pamphlet, any promise, or any description of the product. Without regard to the privity question, the proof fails to establish an express warranty and the submission of that issue to the jury is prejudicial and reversible error.
 
 
 11
 The implied warranty issue is more difficult. The Uniform Commercial Code, adopted in Oklahoma, provides for an implied warranty of merchantability.[3]
 
 
 12
 The first question is whether the manufacturer's liability extends to a person who is neither a purchaser nor a user. Under the Oklahoma law the warranty extends "to any natural person who is in the family or household of his buyer or who is a guest in his home."[4] The manufacturer argues that this clause has the effect of excluding all those not within the mentioned categories. We are convinced that this was not the legislative intent.[5]
 
 
 13
 The plaintiff was neither the buyer nor the user. The buyer was his employer and the user was a fellow workman. The plaintiff insists that in the situation presented the principle of strict liability applies and that even a bystander might recover. The manufacturer argues that, except in food and drink cases, Oklahoma has never applied the theory of strict liability in implied warranty cases. It points out that in Marathon Battery Company v. Kilpatrick, Okl., 418 P.2d 900, the Oklahoma Supreme Court extended to a purchaser from a retailer the right to recover against the manufacturer for breach of implied warranty but did not extend that right to a person who was neither a purchaser nor user. No Oklahoma decision has considered the specific issue with which we are confronted.
 
 
 14
 The extension of a manufacturer's liability to anyone injured by a product not suitable for the use intended has been the subject of much discussion.[6] In general, privity is not essential where an implied warranty is imposed by the law on the basis of public policy. We believe that the injured employee stands in the shoes of his employer and that his cause of action based on implied warranty is not barred by the shield of privity.[7] The manufacturers know that most businesses are carried on through employees who will actually use the product purchased by their employers. In the absence of an Oklahoma decision to the contrary, we are satisfied that the employee may sue on the theory of implied warranty.
 
 
 15
 The issue then narrows to consideration of whether the evidence sustains a finding of breach of implied warranty. The aforementioned decision in Marathon Battery Company v. Kilpatrick, Okl., 418 P.2d 900, is pertinent. A manufacturer was sued under the theory of implied warranty by a purchaser for injuries sustained as the result of an explosion of a dry-cell battery. The defense was that the battery could not explode. No negligence of manufacture or design was shown. The Oklahoma Supreme Court held that:
 
 
 16
 "* * * the manufacturer's liability was established when it was shown that the plaintiff was injured while using the battery for the purpose intended by reason of a defect as to which he was not aware, and could not have ascertained by examination."[8]
 
 
 17
 The defect claimed here is the separation of the head from the shank of the stud. The separation could have been caused either by a defective stud or by an overcharge in, and improper setting of, the gun. An expert for the plaintiff testified that the separation was caused by a tensile failure. He said that the Rockwell Hardness Test showed "industrial strength somewhat below the optimum hardness," but declined to say that this condition caused the failure. He also found "inclusions" in the studs and testified that: "I believe they were weaker than they should have been to sustain the stress required to maintain the nail from breaking at the head." Defense experts gave contradictory testimony.
 
 
 18
 Thus, our case is somewhat stronger than Marathon. There no defect in the battery was shown. It simply exploded. Here the fact of separation is bolstered by expert testimony of insufficient tensile strength. It is enough to sustain liability unless the separation was caused by improper use.
 
 
 19
 We have here an inherently dangerous product. Although our concern is with a stud rather than with the gun or cartridge, the stud was designed, made, and sold for the use to which it was put. The possibility of separation and ricochet may not be disregarded.[9] The stud is harmless in itself, but, when used for the purpose intended, it is a component of a lethal weapon.
 
 
 20
 The manufacturer says that the accident to the plaintiff resulted from misuse of the equipment and that such misuse relieves it from liability. The claim of misuse is based on the facts that Hensley used a stronger cartridge than that prescribed by his superior and changed the plunger setting. The effect of these changes was to secure greater striking power and greater penetration. Also they imposed a greater strain on the tensile strength of the stud.
 
 
 21
 The stud was used for the "ordinary purposes" for which it was made and sold,[10] that is, to fasten a wooden board to a steel I-beam. When used for that purpose, the head and the shank should not separate. The fact that they did separate shows either that the stud was defective or that the gun was not used properly. The question was one of fact for jury determination.[11] We are convinced that the submission of the case to the jury on the theory of implied warranty was proper.
 
 
 22
 The final claim of the manufacturer is that the plaintiff was contributorily negligent by his presence in an area where a ricochet was possible. We have doubt whether contributory negligence is a defense to an action on implied warranty.[12] Our attention is called to no Oklahoma decision on the point. If the defense is permissible in that state, the question of contributory negligence was submitted to the jury and resolved against the manufacturer. The verdict is supported by substantial evidence in this regard.
 
 
 23
 In view of our holding that the judgment must be reversed because the evidence does not sustain a claim of express warranty, the question of misconduct of a juror is moot.
 
 
 24
 Reversed and remanded for a new trial consistent with the views expressed herein.
 
 
 
 Notes:
 
 
 *
 Of the District of Columbia Circuit, sitting by designation
 
 
 [1]
 See Connolly v. Hagi, 24 Conn.Sup. 198, 188 A.2d 884, 886, and Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 83, 84, 75 A.L.R.2d 1
 
 
 [2]
 12A Okl.St.Anno. § 2-313(1) which reads: "Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."
 
 
 [3]
 It is provided in 12A Okl.St.Anno. § 2314 that "a warranty that goods shall be merchantable is implied in a contract for their sale" and that: "Goods to be merchantable must be at least such as * * * (c) are fit for the ordinary purposes for which such goods are used; * * *." Section 2-315 covering implied warranties of fitness for a particular purpose does not apply because we are concerned with a use customarily made of a product
 
 
 [4]
 12A Okl.St.Anno. § 2-318
 
 
 [5]
 In the comment following § 2-318 appears the following: "3. This section expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain."
 
 
 [6]
 See Prosser, Law of Torts, Ch. 19, § 97, p. 672 et seq.; 2 Harper & James, Torts, p. 1570 et seq.; and Restatement, Torts 2d § 402A, p. 347 et seq. A comprehensive annotation is found in 75 A.L.R. p. 49 et seq. In the Tenth Circuit we have Burgess v. Montgomery Ward and Company, 10 Cir., 264 F.2d 395, and B. F. Goodrich Company v. Hammond, 10 Cir., 269 F.2d 501, both Kansas cases, and Quick-Way Truck Shovel Co. v. Great American Insurance Company, 10 Cir., 314 F.2d 702, affirming and adopting, D.C., 204 F.Supp. 847, a Colorado case concerned with an Idaho accident
 
 
 [7]
 See Delta Oxygen Company v. Scott, 238 Ark. 534, 383 S.W.2d 885, 893; Childs v. Austin Supply Co., 408 Pa. 403, 184 A.2d 250, 252; and Peterson v. Lamb Rubber Company, 54 Cal.2d 339, 5 Cal. Rptr. 863, 353 P.2d 575, 581
 
 
 [8]
 418 P.2d 915. Although this decision predated the adoption of the Uniform Commercial Code by Oklahoma, nothing in the Code changes the principle announced by the court
 
 
 [9]
 A defense witness who worked at the accident site as a glazier and who used the type of equipment here under consideration testified as to the observance on occasions of richochets
 
 
 [10]
 See 12A Okl.St.Anno. § 2-314
 
 
 [11]
 Adams v. Scheib, 408 Pa. 452, 184 A.2d 700, 705
 
 
 [12]
 See Dallison v. Sears, Roebuck and Co., 10 Cir., 313 F.2d 343, 346