Richard GARNER et al., Plaintiffs-
Appellants.

v.

HALLIBURTON COMPANY, a Delaware
corporation, Defendant-Appellee.

No. 72–1442.

United States Court of Appeals,
Tenth Circuit.

Feb. 26, 1973.

Rehearing Denied March 26, 1973.

Don Manners, Oklahoma City, Okl. (Murray E. Abowitz, Bethany, Okl., on the brief), for plaintiffs-appellants.

Truman B. Rucker, of Rucker, Tabor, McBride & Hopkins, Tulsa, Okl. (Donald G. Hopkins, of Rucker, Tabor, McBride & Hopkins, Tulsa, Okl., and John B. Cooper, Duncan, Okl., on the brief), for defendant-appellee.

Before HILL and DOYLE, Circuit Judges, and O'CONNOR, District Judge.

WILLIAM E. DOYLE, Circuit Judge.

The plaintiffs above named filed actions in the district court of Creek County, Oklahoma. These individual actions were removed to the United States District Court for the Northern District of Oklahoma, and subsequently were transferred from that court to the United States District Court for the Western District of Oklahoma where pretrial proceedings were carried out and finally the case was tried. Following a four-day trial, the district court granted the motions of Halliburton Company for directed verdicts. Final judgments were entered in favor of Halliburton and against the several plaintiffs, and these are the judgments which have been appealed and which are now before us.

I.

The claims of the plaintiffs were based on personal injuries suffered when a flash fire occurred at the scene of an oil and gas well which had been drilled to a depth of 17,200 feet and which was in the process of being abandoned by Humble Oil, the owner. The plaintiffs were workmen who, at the time of injury, were engaged in making preparations for the salvaging of the casing. Richard Garner and Thomas S. Snuggs were employed by Helmerich and Payne International Drilling Company. Billy L. Mains and Jack Pearse were employees of the Nichols Casing Crew.

Humble Oil and Refining Company, the owner, had contracted with several other companies to carry out the drilling operation on the well which had been designated as the K. B. Cornell Number One. In addition to Helmerich and Payne and the Nichols Crew, there were several other companies which had rendered service or furnished supplies under contracts with Humble. Included was the defendant Halliburton which delivered and placed some cement in the hole during the course of the drilling.

The actual drilling of the well commenced on October 1, 1968 and continued for four and one-half months, until February 16, 1969. As of this time the well had been drilled to 17,200 feet, but without successfully encountering commercial quantities of oil or gas. Humble determined to abandon it at that point.

The incident here in question occurred on March 2, 1969, at which time the flash fire occurred. The crew was preparing to pull the casing. Great hydraulic pressure had been applied to the casing resulting in dislodging it when the fire occurred.

In essence, the plaintiffs' claims against Halliburton were based on a cementing job which occurred some time prior to the March 2 incident.

On November 30, 1968, Halliburton had been called by Humble to deliver 800 sacks of specified cement containing a

described retarder and 200 sacks of specified cement which contained a described friction reducer. All of this was pumped down the casing at a point at which the well had been drilled to the 12,180 foot level. The plaintiffs' theory is that this cementing job was defective and that it permitted the gas below the 12,180 foot level to escape and that this in turn caused the fire that produced the injuries.

The legal theories of plaintiffs were, first, that Halliburton was negligent in carrying out its contract; secondly, that there was a breach of implied warranty of fitness and, finally, that there was strict liability. The major factual issue was whether the gas originated above or below the 12,180 foot level.

## II.

The judge found that the evidence overwhelmingly established that the gas actually originated above the 12,180 foot level and thus was above the cement which Halliburton had set. If the plaintiffs failed to establish that the gas came from below the 12,180 foot level, there would be a complete absence of a causal factor, and it would follow, of course, that Halliburton's cement could have had nothing to do with the injuries. But even if the gas originated below the mentioned level, Halliburton would not be liable under an implied warranty unless it were established that the cement was faulty and that there was indeed an implied warranty under the Uniform Commercial Code to contain the gas (the plaintiffs seem to tie their claims of implied warranty to this statute), and unless it was also shown that the cementing was for the purpose of containing the gas. The trial court found that this was not the purpose and, therefore, that Halliburton had not undertaken a duty to protect plaintiffs and others similarly situated from the escape of gas from the well.

Another aspect of the trial court's lengthy oral comments on the evidence and law given just prior to the direction of verdicts was that the appellants had not proven that the cement mix was unfit for use at the 12,180 foot level. Appellants felt that the temperature at the bottom of the well was 224 degrees and thus above the boiling level of water. The court found that under the pressure that was present at the time, that the water would boil not at 212 degrees but 400 degrees. The court also found that the cement was proven to have been good hard cement, this being apparent from the cuttings which resulted from the drilling through the cement plug and from pressure tests conducted by Humble both before and after the drilling of the plug.

As to the appellants' contention that Halliburton was negligent in failing to run a temperature test following the pumping of cement into the hole, the court ruled that this test was not the obligation of the cement contractor, but of the operator.

As to the further negligence contention of appellants' based on the failure of the float mechanism, the trial court pointed out that the purpose of the float was to maintain pressure and that a backup system of maintaining pressure was employed so that this situation was not shown to have been capable of spoiling the cement.

On breach of warranty, the trial court found that the Humble-Halliburton contract clearly excluded all warranties, and the court also found that there had never been an implied warranty that the cement was fit to control gas. It further found that the purpose of the contract in this regard limited the scope of the implied warranty. Evidence showed that the purpose of the cement was not to control the gas and prevent the migration of liquids. Accordingly, the trial court found that there was no breach of warranty.

On the theory of strict liability, the court said that there was no proof of causation, but the court said that it was beyond doubt that the gas that burned the plaintiffs had originated above the

cement job. As we perceive it, the plaintiffs in now urging strict liability are seeking to recover under § 402A(2) of Restatement of the Law of Torts 2d, and this aspect of the plaintiffs' case will be discussed hereafter.

### III.

The well in question was a wildcat drilling operation and because of this fact the effort was exclusively Humble's. The drilling was commenced on October 1, 1968. The initial hole was 15 or 16 inches in diameter and approximately 4,000 feet deep. Surface casing 13⅜ inches wide was placed inside the hole and was cemented at this 4,000 foot depth. Thereafter, a 12¼ inch bit was used to drill the hole to a depth of 12,-180 feet which was designated as the intermediate or protective string. A nine and five-eighths casing was then run from the top of the hole to this bottom point. Mud was circulated throughout the casing and up the annulus. Evidence shows that the purpose of this circulation of mud was to allow cuttings to be examined so as to determine the type of strata being drilled. Another purpose was to hold back pressure in any formation that would likely be exposed through the drilling. Weight is added to the mud in order to keep the pressure up. As indicated, the cement was poured down the nine and five-eighths pipe under pressure so that it rose up the annulus for approximately 3,000 feet. One hundred and two feet of cement was left inside the casing. After waiting a period for the cement to harden, the plug was drilled out and 1,500 pounds per square inch of pressure was applied to the entire string of casing. No leak of mud around the casing seal appeared as a result of this test. Humble was apparently satisfied that the cement was properly bonded and that the casing would be able to withstand heavier mud. Thereafter, an 8½ inch bit was used in order to drill the hole to a depth of 17,200 feet.

When the well reached this latter depth without discovering any commercial gas or oil, Humble decided to abandon the well and the preparations described above were commenced in March 1969, and the unfortunate incidents producing injury to the plaintiffs occurred.

Reviewing the trial court's action in directing verdicts, we have been called on to search the record in a quest for substantial evidence in support of any one or more of the plaintiffs' theories. Unfortunately for the plaintiffs our quest has not been productive, and so we must conclude that the action of the trial court in directing verdicts was fully justified. A brief description of the testimony on the liability issue presented on behalf of the plaintiffs will demonstrate this.

James Melton, mechanical engineer, testified as to the action of heat on chemicals. He testified that a temperature of 224 degrees fahrenheit (which was the accepted temperature at the 12,180 foot level) would boil water out of the cement mixture. But when he was cross-examined he said that water does not boil well under pressure and he acknowledged that the pressure at 12,-180 feet was great.

He also said that if the cement did harden, a temperature of 224 degrees fahrenheit would not cause it to crumble or deteriorate. He also admitted on cross-examination that the Bariod mud log [1] revealed numerous places above the 12,180 foot level where trip gas was shown. These are pockets of gas that are encountered in the course of a movement of the drilling equipment.

Albert N. Gist is an engineer whose deposition was taken by Halliburton. The deposition was offered on behalf of plaintiffs.

He said that Humble and not Halliburton determined the type of cement, although the graduated amounts of the ingredients were based on a recommendation from Halliburton.

---

1. A daily log which shows the chemical testing which was made on the drilling mud each day.

The purpose, according to him, of cementing a well was 1) to stabilize the casing; 2) to guard weak formations against higher mud pressures; and 3) to control gas and oil. The court noted that he was talking about the use of cement generally and not its purpose in this instance.

Mr. Gist was of the opinion that the gas which produced the harm here came from a level above that at which the cement was placed, that is, 12,000 feet. This was predicated on his view that the cement was good and that if the gas came from below this level there would have been greater pressure on the well head. He conceded that his opinion as to lack of pressure was based on a slight determination. He did, however, state that if the cement job was sufficient the gas from below the 12,000 foot level could not have reached the surface.

He was asked how the gas could get up between the two casings where it was burning, and he stated that it would migrate through the mud; that eventually gas will migrate to the top of a mud column; and that there was a lot of open hole between the top of the cement and the surface of the ground.

The plaintiffs as part of their case offered this deposition and undoubtedly they tendered it because of the fact that Mr. Gist said that cement was used generally to control gas and oil.

The plaintiffs' best witness was one Benny Joe Bailey, who had worked as a production and drilling engineer for a major oil company and had reached this position on the basis of experience rather than formal training.

Mr. Bailey said that if the float shoe does not hold, the cement will back up into the pipe. The float collar and shoe were furnished by Halliburton. It was brought out, however, that the log showed that 900 pounds of pressure was applied and this would raise the cement 2700 feet up the side of the pipe.

He also said that the pressure could hold for 30 minutes (this was in reference to the test that was performed), but the cement could fail later due to its being loosened as a result of the renewed drilling.

He stated, in addition, that there was high pressure gas at 12,200 feet and that if it were to go to the surface it would proceed up the annular space, but that if it were cemented off properly this could not occur.

On cross-examination Mr. Bailey testified that 15 percent of the cement poured into the pipe was lost in the formation. He acknowledged that this would leave 2700 feet of cement up the side of the casing and that it was only necessary to leave 1000 feet up the side of the casing. He also acknowledged that mud was used to control gas.

The testimony of Melton and of Gist contributed little to the plaintiffs' contention 1) that the cement job was faulty, and 2) that this was the proximate cause of the escape of the gas which produced the fire which injured the plaintiffs. Melton merely described conditions which would produce faulty concrete, and the Gist testimony, considered in the light most favorable to the plaintiffs, was that cement is indeed used to contain gas.

The Gist testimony that the cement, if properly installed, would have contained the gas below the 12,000 foot level perhaps comes closer than any of the remaining evidence of the plaintiffs to developing a tenable theory. At the same time, Gist was definitely of the opinion that the gas which ignited originated above the 12,000 foot level, and so this testimony is, in the final analysis, of little value because, as the trial court said, the overwhelming weight of the evidence establishes that the cement did not fail and that the gas came from above the 12,000 foot level.

## IV.

### A. THE ALLEGED DEFECTIVE CONDITION—THE THEORY THAT THE CONCRETE FAILED

Plaintiffs' case is wholly dependent on proof that the cement job at the 12,000

foot level was inadequate and that because of this gas escaped some months later after the concrete was drilled. This followed the drilling of the well by Helmerich and Payne International Drilling Company for an additional 5000 feet, and after enormous pressure was applied in preparation for the pulling of the casing.

The plaintiffs-appellants' theory that the cement failed and that this allowed gas originating below the 12,000 foot level to escape has little more than a speculative basis. The evidence shows nothing more than theorizing from the occurrence itself. There is no evidence that Halliburton failed to carry out its task in accordance with accepted standards, and there is no actual proof that the cement did not jell, so to speak. On the contrary, the evidence shows that from the cuttings in connection with the drilling through the cement soon after it was installed that the cement was hard. Further, the pressure tests which were carried out after the installation established that it had hardened.

■ Regardless of whether the action is thought of in terms of liability for negligence or implied warranty under the Uniform Commercial Code or implied warranty under § 402A(2) or as a strict liability case, it is essential that there be evidence to establish that the defendant acted or failed to act in relationship to the plaintiffs in such a manner as to create an unreasonable risk of harm or so as to have committed a breach of an implied warranty of suitability, or the defendant must have created a defective condition unreasonably dangerous to the user or consumer. The failure of the evidence to establish the existence of a dangerous or hazardous condition renders the case insufficient.

## B.  IMPLIED WARRANTY

We have had occasion to take up so-called products liability cases under Oklahoma law previously. The case from Oklahoma which we look to is Marathon Battery Company v. Kilpatrick,

418 P.2d 900 (Okl.1965), a carefully researched and extensively analyzed opinion. Plaintiff there was injured while holding a battery which he had purchased from a sales agent of Marathon, the manufacturer. While holding the battery it exploded causing extensive injury. The Oklahoma Supreme Court rejected the contention of defendant as to the inadequacy of the evidence as to defectiveness, holding that the liability was established when it was shown that plaintiff was injured while using the battery for the purpose intended, and was injured as the result of a defect as to which he was not aware and could not have ascertained by examination. In *Marathon*, the existence of a defect could not be questioned, for as in Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962), cited and relied on in *Marathon*, the manner of the happening (i. e. the explosion), established the defective character, for a product such as a six-volt storage battery which is to be used for storing electrical energy and making it available when needed does not ordinarily explode unless it has a defect.

■ The same was true in a case considered by this court, Speed Fastners, Inc. v. Newsom, 382 F.2d 395 (10th Cir. 1967). There a powder-loaded gun was being used to drive studs through a steel I-beam for the purpose of attaching wood to it. The head and shank of the stud separated and the shank richocheted out of the wood and struck the plaintiff. It was held that the dangerousness of the product was demonstrated by the misfiring and the consequent striking of the plaintiff. The tool was being used for the purpose for which it was manufactured. In both of these cases and in our most recent products liability case, White Motor Corporation v. Stewart, 465 F.2d 1085 (10th Cir. 1972), the defect was evidenced, if not by direct testimony, by circumstances which left no room for doubt that the product was defective. But in our case circumstances are inconclusive and the result remains problematical.

## C. NEGLIGENCE

The case here is no better when judged on a negligence theory, for here again it is essential that the plaintiffs establish that the defendant's conduct fell below the standard established by law for the protection of others against unreasonable risk of harm. Thus, the plaintiffs' evidence, whether direct or circumstantial, has to show that the defendant created a condition which was hazardous to the plaintiffs. Here the theory of plaintiffs is that it was defective cement which created a hazardous condition. But we do not know that the cement was defective. We only know that gas escaped. The cement looms as the least likely possibility. *See* Restatement of the Law of Torts 2d §§ 281–82 dealing with the elements of a cause of action for negligence and the standard by which negligence is determined. A claim based upon the negligence standards assumes that there will be evidence as to the hazardous condition which will allow the trier of the fact to determine whether liability flows from it, but where the evidence leaves the judge in doubt as to what produced it, and the thing does not speak for itself whereby the doctrine of *res ipsa loquitur* could come into play, there is no way to rule that the cause is sufficient.

## D. IMPLIED WARRANTY—U.C.C.

The plaintiffs encounter even further difficulty when they invoke the Oklahoma Uniform Commercial Code provisions, and at trial they sought to recover under the implied warranty of fitness section, 12A Okl.Stat.Ann. § 2–315. The judge repeatedly pointed out that an action which arises under that section must proceed within a somewhat rigid

famework, that is, the plaintiff must show that he came within the use which the buyer had in mind for the product.[2]

In the case at bar the plaintiffs introduced evidence only as to the general use of cement at this level. The parties to the contract, Humble and Halliburton, offered testimony that the sole objective of the cement was to stabilize the casing. It seems clear that if an injured person proceeds under the above section of the Uniform Commercial Code in Oklahoma, he must bring himself within the objects of the sale.[3]

## E. THE DEARTH OF EVIDENCE TO ESTABLISH PROXIMATE CAUSE

A further deficiency in the plaintiffs' case is the lack of effective proof connecting Halliburton with injuries to the plaintiffs. Not only was the fire remote in time from Halliburton's cement job, it was remote in space as well, the cement being 12,000 feet from the surface and not subject to inspection. Subsequent events also contributed to the remoteness. Halliburton was on the job for a very short time. Subsequent to Halliburton's departure, the drilling continued to the 17,000 foot level and after that there were preparations for the pulling of the casing. In addition, the trial court found that the overwhelming evidence established that the gas which caused the harm originated above the 12,000 foot level. The numerous pockets encountered in the course of the drilling, together with other circumstances, render the plaintiffs' hypothesis a mere possibility and one which was much less likely than the opposing hypothesis that Humble and its subcontractor who were in possession at

---

2. In Utley v. Standard Magnesium & Chem. Co., 478 P.2d 953, 955 (Okl.1970), the Oklahoma Supreme Court declared that implied warranty of fitness for a particular purpose must be specifically pleaded and proved.

3. There is no particular reason why an injured person would need to or find it advantageous in most instances to proceed under Uniform Commerce Code provisions since Oklahoma has in the Marathon Battery case, *supra*, accepted the essential elements of strict liability, even though it does not designate it as such but rather calls it implied warranty.

all times were responsible for the escape of the gas and the fire. The cause is, of course, an element common to each and all of the claims asserted by the plaintiffs.

\* \* \* \* \* \*

Finally, the difficulty which we see in the case is that the plaintiffs depend on the surrounding circumstances to establish liability and yet they have no basic fact sufficiently strong to give rise to the inferences which are indispensable to an action sounding in any of the theories that are advanced. Here the circumstances do not bespeak the fault of Halliburton. Indeed, the circumstances are consistent with the conclusion that no one was at fault because many factors could cause gas to escape from a well such as the K. B. Cornell Number One. In this respect the case is vastly different from Marathon, *supra*, Speed Fastners, *supra*, and White Motor, *supra*. In each of these cited cases there was fault in the air, so to speak, and also fault attributable to the defendant. The case at bar is deficient in both areas.[4]

We conclude that the trial court was correct in granting the defendant's motion for directed verdicts.

The judgment is affirmed.

4. Professor Prosser sums up the problem of inconclusive circumstances with respect to the defendant's connection in the course of the discussion of *res ipsa* as follows:

> It is never enough for the plaintiff to prove merely that he has been injurd by the negligence of someone unidentified. Even though there is beyond all possible doubt negligence in the air, it is still necessary to bring it home to the defendant. On this too the plaintiff has the burden of proof by a preponderance of the evidence; and in any case where it is clear that it is at least equally probable that the negligence was that of another, the court must direct the jury that the plaintiff has not proved his case. The injury must either be traced to a specific instrumentality or cause for which the defendant was responsible, or it must be shown that he was responsible for all reasonably probable causes to which the accident could be attributed. Accordingly res ipsa loquitur is held not to apply where a chair is thrown from an unidentified window in the defendant's hotel, or where the presence of such an object as a bolt on a railway platform might easily have been due to the act of a third party, or where gas or water or electricity escape from fixtures controlled in part by another.

Prosser on Torts (3rd ed.) at 222. *See also* the numerous cases in 33 A.L.R.2d 791; Restatement of Torts 2d 328(d), comment on clause (b) of subsection (1); and 58 Am.Jur.2d 55–58 §§ 480–81.